Norman E. KREHL, Rita C. Krehl, Clifton Rosett, Lois Rosett, Paul D. Thomas, Frances A. Thomas, Charles W. Newman, Doris M. Newman, Raymond F. Butts, Betty A. Butts, Anthony Feicco Jr., Carol Feicco, Jack Bergsman, Riva Bergsman, Anthony J. Castello, Bertha L. Castello, Gordon Rubin, Harriett Rubin, Walter F. Todd, Robert Janis and Dorothy Janis, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

BASKIN–ROBBINS ICE CREAM COMPANY, Baskin-Robbins, Inc., 31 Flavors Stores Realty Inc., Creamland Dairies Inc., Lily Ice Cream Company, McDonald Corporation, Northland Milk and Ice Cream Company, Dean Food Company, the Ideal Pure Milk Company, Colonial Ice Cream Company, Alpenrose Dairy Inc., The Southland Corporation, Klinke Brothers Ice Cream Company, Associated Milk Producers, Inc., Defendants.

No. CV 76–1797–DWW.

United States District Court, C. D. California.

Feb. 10, 1978.

Richard Calkins, Burditt & Calkins, W. Yale Matheson, Chicago, Ill., Stuart Herman, Richman & Herman, Beverly Hills, Cal., for plaintiffs.

Stuart L. Kadison, Sonia F. Crow, Dennis G. Martin, Kadison, Pfaelzer, Woodward, Quinn & Rossi, Ernest A. Braun, Bartman, Braun & Halper, Los Angeles, Cal., for defendants.

Robert E. Willard, Holley, Galen & Willard, Los Angeles, Cal., Howard M. Dupuy, Jr., Phillips, Coughlin, Buell, Stoloff & Black, Portland, Or., for defendant, Alpenrose Dairy Inc.

Peter Benzian, Latham & Watkins, Los Angeles, Cal., for defendant, Dean Food Co.

Les J. Weinstein, George F. Hemingway, McKenna & Fitting, Los Angeles, Cal., for defendant, The Southland Corp.

## ORDER RE CERTIFICATION UNDER RULE 23 F.R.C.P.

DAVID W. WILLIAMS, District Judge.

Twenty store franchise owners have brought this antitrust action against Baskin-Robbins Ice Cream Co., its subsidiaries and its area franchisors alleging violations of § 1 of the Sherman Act (15 U.S.C. § 1) and § 3 of the Clayton Act (15 U.S.C. § 14). Jurisdiction is claimed under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C §§ 1331 and 1337. The complaint was filed on June 4, 1976. A first amended complaint was filed August 3, 1976, alleging that the defendants conspired to restrain trade by: (1) tying sales of ice cream products, store leases, equipment, supplies and advertising to the sale of the Baskin-Robbins trademark; (2) by fixing the wholesale prices of ice cream products; and (3) by maintaining the resale price of ice cream products. Plaintiffs have raised an additional allegation of territorial mar-

ket division and propose to amend their complaint appropriately to include this allegation. As to each of the claims, the plaintiffs pray for treble damages, injunctive relief, costs and reasonable attorneys' fees.

Plaintiffs have moved this court under Rule 23(c)(4) of the Federal Rules of Civil Procedure for an order certifying this suit as a class action. The proposed class would encompass past and present franchisees of Baskin-Robbins, a group in excess of 1,700.

Baskin-Robbins Ice Cream Co. (BRICO) operates the nation's largest chain of ice cream stores. The franchise program is structured into three principal levels of distribution. At the top is BRICO which manages the chain. A subsidiary of BRICO, 31 Flavors Realty, Inc., also functions at this top level. It is the prime lessor on all Baskin-Robbins store properties. At the second level are the eight independent area franchisors and Baskin-Robbins, Inc. These entities operate as the suppliers and franchisors for the approximately fourteen market areas. The area franchisors are contractually bound to BRICO by the Area Franchise Agreement. The area franchisors and B–R Inc., have two principal functions: (1) they are licensed as the exclusive manufacturer and distributor of Baskin-Robbins ice cream products in their region, and (2) they are the franchisors in their area and, as such, are responsible for enlisting new retail store owners. The third level of the system consists of the store owners. These owners are contractually bound to BRICO and the area franchisor by the standard form Store Franchise Agreement. A uniform agreement is used throughout the country by BRICO. In addition, the store owners are bound to 31 Flavors Realty, Inc. by the sublease of the store location.

To qualify for certification under Rule 23 of the Federal Rules of Civil Procedure, the plaintiff has the burden of proving that all four elements of Rule 23(a) are satisfied and that one or more of the three alternatives of 23(b) are met. *Al Barnett & Sons, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43, 47–48 (D.Del.1974). On a class

certification motion only the elements of Rule 23 are in issue; the Court must assume that the substantive allegations of the complaint are true. *Blackie v. Barrack*, 524 F.2d 891, 900–01 (9th Cir. 1975). At several junctures the parties have mistakenly framed their arguments as if the merits of certain claims were the ultimate issues in deciding this motion. A Rule 23 motion is not the appropriate time to reach the merits. *Presidio Golf Club v. National Linen Supply Corp.*, 1976–2 Trade Cases ¶ 61,221 (N.D.Cal.1976). The Court cannot even consider whether the claims, taken in the light most favorable to the plaintiffs, fail to state a cause of action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732, 749 (1974). The proper extent of the Court's inquiry into the claims raised by plaintiffs' pleadings is an analysis of the nature and range of proof that, in the best judgment of this Court, will be necessary to establish each of the allegations.

Although each separate type of antitrust violation alleged involves distinctive elements, all are subject to the basic requirements of a cause of action under § 4 of the Clayton Act. Plaintiff must establish a violation of the antitrust laws by the defendant, he must show injury or damage to his business or property (fact of damage), and he must show the quantum of damages. *Shaw v. Mobil Oil Corp.*, 60 F.R.D. 566, 568 (D.N.H.1973).

## I. *The Rule 23(a) Prerequisites*

Rule 23(a) provides:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

### A. Numerosity and Common Questions

There is little dispute that the first two elements are satisfied. A potential class of 1,700 members is, *a fortiori*, sufficiently numerous to preclude joinder. Common questions abound in each of the claims raised by plaintiffs. The very nature of the conspiracy allegation raises common questions. In addition, several practices that are outlined in either the Store Franchise Agreement or the Area Franchise Agreement are challenged as illegal on their face. For instance, the requirement that each store owner sell only ice cream products of Baskin-Robbins, coupled with the provision making the area franchisor the exclusive manufacturer and supplier of Baskin-Robbins ice cream products in his area are challenged as illegal tying arrangements and illegal horizontal market division. The legality of these provisions is a common question. The dispute is not whether common questions of law and fact exist, but whether they predominate.

### B. Typicality

The typicality requirement of 23(a)(3) presents closer issues. There have been two lines of argument by the defendants under this subsection. The first is that because of alleged differences among the franchises operated by these plaintiffs and the "average" franchise in the putative class, the claims of these plaintiffs are not typical. The second argument, made principally by defendants Alpenrose Dairy Inc. (Alpenrose) and Dean Foods Co. (Dean) is that because there are no franchisees among the plaintiffs who operate stores within the Alpenrose or Dean areas, these plaintiffs cannot have claims typical of franchisees who actually do business with these area franchisors.

While courts have differed over the proper test of typicality, (*see* 7 Wright and Miller, Federal Practice and Procedure § 1764) this Court adopts the formulation in *Pendleton v. Schlesinger*, 73 F.R.D. 506, 509 (D.D.C.1977). This test, which follows, defines a discrete scope for this subsection without usurping the purpose of the other sections of Rule 23.

"(A)lthough the claims or defenses of the class members need not mirror each other, 'Rule 23(a)(3) may be used to screen out class actions when the legal or factual position of the representatives is *markedly different* from that of other members, even though common issues of law or fact are raised.'" (emphasis added).

The alleged distinctions among these plaintiffs and the class they seek to represent do not meet the "markedly different" test of *Pendleton*. Defendants argue that because of the regional nature of the administration of the Baskin-Robbins system the grievances of each plaintiff depend upon the identity of his supervisors and are typical only of the limited class supervised by the same people. To the contrary, the typicality test does not mandate that claims be identical. Since each franchisee is contractually bound to live by the rules of his store franchise agreement, whatever the variations in managerial personalities from region to region, they would not raise problems of typicality for plaintiffs.

Defendants also fail to show marked differences among plaintiffs and the class as to specific claims. Defendants argue vigorously that the only plaintiffs who could represent a class of franchisees injured by the alleged tying arrangement involving equipment in the purchase of a new store are the Krehls.[1] It is further argued that the Krehls do not have claims typical of the class because they made several purchases of unauthorized equipment, and because they were not intimidated by Baskin-Robbins purchasing regulations, having owned

---

1. Other plaintiffs either purchased from the defendants more than four years prior to the filing of the complaint or they purchased from an existing owner. In the first instance, the defendants argue that these plaintiffs are barred from being class representatives because of the need to show fraudulent concealment. In the latter case they are alleged to be inadequate representatives because they could not have been injured by the tying arrangement.

two previous franchises. A reading of both the Krehls depositions reveals a sufficient basis from which to conclude that the Krehls may have been injured by the "turn-key" concept of selling a fully equipped store. Assuming that the Krehls are the only plaintiffs who could represent a class injured by the purchase of a store under the "turn-key" concept, their claims would be typical of the class.

It is also claimed that because of the numerous unauthorized substitutions of supply items by these plaintiffs, they cannot represent typical claimants. Review of the deposition testimony indicates that a sufficient number of approved purchases were made by the named plaintiffs to allow them to assert typical claims.

Defendants suggest that because none of the plaintiffs followed the suggested retail prices of Baskin-Robbins that their resale price maintenance claim could not be typical of the class. It cannot be determined at this stage whether plaintiffs have been retaliated against because of maverick pricing policies. If plaintiffs can show retaliation, their claims would be sufficiently typical in this area.

The argument made by Dean and Alpenrose on the typicality requirement is different from those discussed above. Their position, as succinctly put as possible, is that a plaintiff who is a customer of defendant A cannot have typical claims against defendant B with whom he has no dealings, even though A and B have injured their customers by nearly identical conduct. This principal is enunciated in *La Mar v. H. B. Novelty & Loan Co.*, 489 F.2d 461, 465–66 (9th Cir. 1973). Two cases were consolidated under the La Mar caption. The named case involved Truth-In-Lending claims by a customer of a pawnshop on behalf of the class of pawnshop customers in Oregon. The second action was a class suit by a passenger of TWA and Piedmont Aviation challenging the fare construction system employed by those defendants and six other domestic airlines. Discussing the typicality requirement, the Court stated:

"We believe that this prerequisite is also lacking when the plaintiff's cause of action, although similar to that of other members of the class, is against a defendant with respect to whom the class members have no cause of action. Those who purchased tickets from the six appellee airlines, from whom the representative plaintiff purchased no tickets, have no cause of action by the reason of such purchases against the airlines from whom the representative plaintiff purchased. In brief, typicality is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies." 489 F.2d at 465.

The distinction between this case and the cases in *La Mar* is that the plaintiffs here allege a nationwide conspiracy to restrain trade. The *La Mar* decision specifically excepted the case of a conspiracy from its holding that a plaintiff who did not have actual dealings with a class defendant could not be an adequate representative. *Ibid.* at 466. While the conspiracy exception was discussed in the context of adequacy of representation, 23(a)(4), this Court believes that it is equally applicable to typicality of claims, 23(a)(3).

Defendants object that the record does not support the nationwide conspiracy allegation. The simple answer to this contention is that the Court is bound to take the allegations of the complaint at face value in deciding this motion. More can be said, however, on this issue. On December 19, 1977, this Court denied a motion for summary judgment on the question of standing to sue. The motion was brought by Alpenrose on behalf of various area franchisors. The pivotal question raised by that motion was whether plaintiffs' claim of conspiracy against the area franchisors was, in actuality, a claim of many individual conspiracies between BRICO and each area franchisor. Had the Court found separate conspiracies, all the area franchisors except McDonald and Baskin-Robbins, Inc., would have been dismissed since plaintiffs could not have shown direct injury at the hands of the

other defendants. The Court relied on *United States v. American Honda Motor Co.*, 271 F.Supp. 979 (N.D.Cal.1967) in denying the motion. In that case, the regional versus national conspiracy issue was raised in the context of a motion to dismiss by the defendant on a theory of double jeopardy. The government had instituted previous prosecutions against American Honda Co. and its distributors in different regions of the country. The defendant maintained that these prosecutions were all part of a single national price maintenance conspiracy. The government maintained that each set of regional distributors was concerned only with price maintenance in its own region, and that therefore, separate conspiracies were involved. The court found the conspiracy to be national in scope.

"It is unrealistic to conclude that dealers in one region were wholly unconcerned with the maintenance of prices in other regions and concerned only with price maintenance by dealers in their own particular region. Although the degree of concern might have been greater as to price maintenance, *vis a vis* discounting among dealers within a particular region, dealers in every region, nevertheless, had a stake in maintaining an overall national pricing policy which, if allowed to deteriorate into discounting in one region, would soon spread to invite discounting in other regions . . .

If there was such a sharing of a common objective, which local dealers and regional associations furthered by contributing their part, it would make no difference that dealers and associations came into the nationwide conspiracy at different times and at different places, or that they did not personally know one another or all details of the conspiracy everywhere or that there were local variations—so long as it could be found that they shared American Honda's objective." 271 F.Supp. at 98.

This Court concluded that an issue of material fact exists as to whether the area franchisors shared a common objective with BRICO to restrain trade. Defendants may at some later time demonstrate the absence of common objective, but for purposes of this motion, a nationwide conspiracy is assumed to exist. The area franchisors are, therefore, not within the *La Mar* exclusion from certification under either 23(a)(3) or 23(a)(4).

### C. *Adequacy of Representation*

There are two aspects to the prerequisite of adequate representation: first, the legal representation of the named plaintiff must be competent and, second, the interests of the representatives and the class must be free from conflicts. *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26, 28–29 (S.D.N.Y.1972). Defendants do not take issue with the competence of plaintiffs' counsel, but they do maintain that the hostility between the plaintiffs, as a group, and the class they seek to represent prevents adequate representation. Defendants base this claim on the results of a vigorous campaign by the BRICO management soliciting opt-outs from the yet uncertified class in which 543 of 1,700 indicated opposition to this suit. This same contention was raised in *Merit Motors, Inc. v. Chrysler Corp.*, 16 F.R.Serv.2d 543 (D.D.C.1972) in which the court found that the proper method of gauging class disinterest is through the tabulation of opt-outs returned in response to a court approved notice, not by response to management pressure. It is not a proper tactic for management to solicit opt-outs from its franchisees without court authorization. Defendants may not use the results of such a poll to argue inadequate representation.

It is concluded that plaintiffs satisfy the 23(a) prerequisites for certification of the class.

## II. Rule 23(b)

### A. *23(b)(2)*

Although plaintiffs' chief reliance is upon 23(b)(3), they have argued that the resale price maintenance claim should be certified under 23(b)(2) as well. The latter subsection provides:

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . ."

The Court rejects certification under this theory for two reasons. First, this subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. *See* Notes of the Advisory Committee, 39 F.R.D. 69, 102. It is apparent from plaintiffs' late exposition of the 23(b)(2) theory that they are using this as a fall-back position, and that their primary reliance is upon 23(b)(3). *See Al Barnett & Sons, Inc. v. Outboard Marine Corp.,* supra, at 47 n. 2 and 52 (noting that most courts faced with antitrust treble damage claims which include requests for injunctive relief hold that class certification cannot be maintained under 23(b)(2)).

Secondly, it does not appear that defendants, if they have, in fact, acted to coerce store owners to maintain prices below a maximum set by the company, have done so on grounds generally applicable to the class. There is no contractual provision specifying resale prices. While plaintiffs have alleged individual instances of coercion within the McDonald area, defendants demonstrate that there is no general adherence to any price guidelines and that the company policy is to allow stores to set their own prices. The resale price maintenance claim is, therefore, not amenable to class treatment under 23(b)(2).

### B. 23(b)(3): The Predominance of Common Questions

Plaintiffs rely chiefly on satisfying the third provision of 23(b) to complete the showing necessary for certification. 23(b)(3) requires that the Court determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the con-

troversy." To determine if a class action is superior to other procedures, the Court is required to consider, *inter alia,* "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and "(D) the difficulties likely to be encountered in the management of a class action."

The Court has considered the proof that will be required in a jury trial of plaintiffs' claims and finds that each of them will greatly tax the resources of this Court. Nonetheless, the Court feels compelled to certify the allegation of wholesale price fixing as to ice cream products, the territorial market division claim, and the tying claim as to ice cream products. In the foregoing claims, the class questions overwhelmingly predominate the individual questions. These three claims are manageable on a class basis chiefly because the issue of fact of damage will be susceptible to classwide proof. Proof of these claims would not be greatly simplified if they were tried by the plaintiffs individually rather than on a class basis. On the other hand, the Court is not persuaded that class treatment would be advantageous as to the balance of the price fixing, tying, and resale price maintenance claims because issues of fact of damage and, in some cases, coercion present unmanageable individual issues.

### 1. The Tying Claim:

 Plaintiffs have alleged that the following products have been illegally tied to the sale of the Baskin-Robbins trademark: (1) ice cream products, (2) store leases, (3) equipment package, (4) supplies, (5) advertising. The prima facie case is the same for each of these claims. There are five elements of a per se tying violation: (1) there must be a tying arrangement between two distinct products or services, (2) the defendant must have sufficient economic power in the tying market to impose

significant restrictions in the tied product market, (3) the amount of commerce in the tied product market must not be insubstantial, (4) the seller of the tying product must have an interest in the tied product, and (5) there must be a modicum of coercion shown. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1212 and 1216–17 (9th Cir. 1977). In addition to showing the tie, plaintiffs must demonstrate fact of damage as an element of the prima facie case. *Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir. 1977). The final element of proof is the quantum of damages. The defendants contest the predominance of common questions as to each element except the third; it is conceded that a substantial amount of commerce in the tied products is involved.

a. *Existence of the Tie and Coercion:*

 The existence of the tie and proof of coercion can be addressed together since they are functionally linked. In the typical franchise case there are two ways in which a tying arrangement can be demonstrated. The first is by express provision in the franchise agreement conditioning the sale of one product, the tying product, on the sale of the second, or tied product. When the tie is a term of the franchise agreement, the plaintiff does not need to show that he was coerced, coercion is implied. *See Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 46 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). The second method of showing the tie, in the absence of an express agreement, is by proving a course of conduct. *Abercrombie v. Lum's Inc.,* 345 F.Supp. 387, 391 (S.D.Fla.1972). In this second instance the buyer must show that he was coerced into purchasing the tied item.

As to the first claim, that the sale of Baskin-Robbins ice cream products was tied to the purchase of the franchise trademark, this term appears in the franchise agreements. The terms of the Store Franchise Agreement specify that the franchisee may sell only Baskin-Robbins ice cream products. By virtue of the Area Franchise Agreement, the area franchisor is the exclusive source of Baskin-Robbins products in his region. Reading the terms together, the store owner is compelled to buy his ice cream products from his area franchisor as a condition of his franchise. The defendants do not challenge this conclusion, but argue that the trademark and the ice cream are not separate products. Even if such a contention is plausible after *Siegel v. Chicken Delight, Inc., supra,* it is a legal question common to the class.

The alleged tie of the store lease and the equipment package can be aggregated since, upon acquisition of a franchise, the store owner obtains both a sublease from 31 Flavors Realty Inc., and the full equipment package. Neither the lease nor the equipment package are expressly tied to the trademark in the franchise agreements. Plaintiffs' support for this tie is provided by documents submitted by BRICO to the Security Exchange Commission and the Federal Trade Commission in which it is admitted that 31 Flavors Realty Inc. is the prime lessor on all stores and that each store is fully equipped and ready for operation before it is turned over to the franchisee. *See* Plaintiffs' exhibits 1 and 2. These documents are offered as proof of coercion common to the class.

The standard for showing coercion in a tying case is established by *Moore v. Jas. H. Matthews & Co., supra* at 1216–1217.

"Although some cases in other circuits have required a showing of actual coercion, . . . our reading of the Supreme Court's opinions supports the view that coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market . . . . Coercion occurs when the buyer must accept the tied item and forego possibly desirable substitutes . . . ." (citations omitted).

BRICO possesses sufficient economic power in its trademark, as will be discussed in more detail *infra,* that, coupled with a showing of 100% franchisee adherence,

class-wide coercion is conclusively demonstrated by the BRICO documents supplied to the SEC and FTC.

Plaintiffs have attempted to include equipment replacement within the ambit of the tie of the initial equipment package sold to new store owners. Neither the SEC nor the FTC documents demonstrate a tie of replacement equipment. The deposition testimony and exhibits before the Court indicate that this claim, if it has merit, could only be substantiated by individual proof of coercion.

There is dispute over whether the fourth alleged tie, that relating to supplies, is explicit in the franchise agreements. The term which arguably constitutes the tie is contained in paragraph ten of the Store Franchise Agreement.

> "RETAILOR ·agrees, in the conduct of the business of said store, to use only supplies, materials and accessories . . of such quality, design and standard or brands as are currently approved in writing by BASKIN–ROBBINS."

BRICO implements this provision by maintaining a list of approved supplies and suppliers who carry these items. BRICO also has arrangements with Martin-Brower, Benchmark Group, and Halper Bros., independent distribution companies, which enable them to service orders by the store owners by maintaining· inventories of the approved supplies.

The supply provision of paragraph ten is almost identical to a term addressed in *Smith v. Denny's Restaurant, Inc.*, 62 F.R.D. 459, at 461 (N.D.Cal.1974). The *Smith* Court concluded as a matter of law, that the supply term did not constitute a tying arrangement without reference to external proof of coercion. The Court reasoned that proof of a course of conduct as to each franchisee would preclude certification. The same conclusion obtains in this case, particularly in light of the fact that Halper Bros. was added as a distributor at the insistence of some of these plaintiffs. This latter fact demonstrates that BRICO was amenable to some suggestions from its franchisees in adding approved distributors.

The final tie, that involving forced contributions of one cent per gallon by the franchisees to the advertising fund, appears in the franchise agreement at paragraph five. The existence of this tie is shown without recourse to proof of coercion.

b. *Economic Power:*

■ A per se showing of tying violations requires that defendants have sufficient economic power in the tying market to impose restrictions in the tied product· market. The focus in determining economic power is whether the seller has sufficient power to raise prices or to impose onerous terms that could not be expected in a completely competitive market. See *Moore v. Jas. H. Matthews, supra,* at 1215. One cannot look at the tied product in isolation to determine if the terms are onerous; one must look at the attractiveness of the package. *See United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*). As in the *Fortner* case in which supracompetitive credit was tied to marginally competitive prefabricated housing, the package can be viewed as a legitimate form of price competition. *Id.,* 429 U.S. at 618–619, 97 S.Ct. at 867, 51 L.Ed.2d at 88–89 n. 10.

The difficulties of proving that the tying packages in this case were burdensome in accordance with *Fortner II* standard can be avoided if the Baskin-Robbins trademark itself is sufficiently unique that economic power can be inferred. It has long been recognized that in the cases of patents and copyrights economic power is presumed. *United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The Ninth Circuit has extended the presumption that exists in the case of patents and copyrights to trademarks. *Siegel v. Chicken Delight, Inc., supra* at 50.

The Court takes note of the sharp criticism of the *Siegel* decision in *Esposito v.*

*Mister Softee, Inc.*, 1976–2 Trade Cases ¶ 61,202 at 70,478 (E.D.N.Y.1976). In *Esposito* Chief Judge Mishler reasoned that a trademark, unlike the patent or copyright, confers no right in gross or at large; the trademark merely identifies a product. Since nearly everything sold today bears a trademark, the Court felt that it was unwise to base a presumption of economic power on the mere existence of a trademark. Chief Judge Mishler read the *Siegel* decision as relying on Chicken Delight, Inc.'s preeminence in the fast-food business, in addition to the existence of the trademark.

While the criticisms of a broad reading of *Siegel* are cogent, this Court finds that the Baskin-Robbins trademark is coupled with such nationwide preeminence in the retail sale of ice cream market that, even with a narrow reading of *Siegel,* sufficient economic power is present as a matter of law.

### c. *Seller's Economic Interest in the Tied Product:*

This element of proof provides a second basis for denying class certification to part of the tying claim as to supplies. None of these products is sold by BRICO or its subsidiaries. BRICO claims that it has no economic interest in any of its suppliers or distributors. Although a showing of an economic interest in one of the distributors would be susceptible to classwide proof, proof as to an economic interest in each of the many suppliers would be unmanageable.

### d. *Damages:*

■ This area involves two distinct elements of plaintiffs' case, fact of damage and quantum of damage. Although the latter is invariably a matter of individual proof, quantum of damage need not prevent class certification, particularly when damages can be computed with reference to a formula. *Blackie v. Barrack, supra* at 905. Fact of damage, on the other hand, is a sufficient ground on which to deny certification when proof will be so individualized and complex that it renders a case unman-

ageable as a class action. *See Windham v. American Brands, Inc., supra* at 66 (4th Cir. 1977); *In re Hotel Telephone Charges,* 500 F.2d 86, 89–90 (9th Cir. 1974); *Oakland County Hearing Aid Service v. Sonoton Corp.,* 1977 Trade Cases ¶ 61,567 at 72,287 (E.D.Mich.1977); *Smith v. Denny's Restaurant, Inc., supra* at 460; *Shaw v. Mobil Oil Corp., supra* at 569.

■ Fact of damage requires proof that the alleged tying violation caused actual injury. In the case of the tie of ice cream products, plaintiffs will be required to show that alternate sources of comparable quality products would have been available, but for the tie. It is possible that such a showing will require proof of the conditions of the wholesale ice cream market in each locality in which there is a franchise. It is, however, more likely that potential competitors to the Baskin-Robbins area franchisors will themselves have to operate on a comparable scale if they are to supply the variety and volume demanded by the Baskin-Robbins franchisee. It is reasonable to assume that such a competitor would, in many cases, compete not only as to individual stores, but as to regions. If this is the case, the Court's burden as to fact of damage will be reduced considerably. Even if the proof must be received on a predominantly local market basis, this claim encompasses a sufficiently discrete product line with relatively stable prices such that classwide proof will be manageable. If proving the amount of damage raises problems of management, individual procedures bifurcated from the main proceeding can be instituted under Rule 23(c)(4).

The situation is quite different as to proving fact of damage with respect to the other tying claims. Plaintiffs have suggested that fact of damage can be shown as to the alleged tie of the sublease by virtue of the $10 per month administrative surcharge imposed on each franchisee by 31 Flavors Realty, Inc. The surcharge does not, taken by itself, assist the plaintiffs in showing fact of damage. The intermediate step in reaching the conclusion that the franchisee was damaged by the surcharge is

a showing that each franchisee could have obtained the same or an equivalent site at the rental rate at which 31 Flavors Realty, Inc. secured the prime lease. The size and reputation of a tenant is a vitally important factor in determining the terms of a commercial lease. A case by case comparison of the lease that a store owner might have gotten with the terms of the sublease written by 31 Flavors Realty, Inc. would bury this Court in a consideration of intangibles. Fact of damage precludes certification of the tying claim as to leases.

The equipment package and the supply tying claims are afflicted by the same problem with respect to fact of damage: because they involve numerous products and suppliers, proof of fact of damage would be unmanageable. The equipment package would pose the further difficulty that plaintiffs would have to show that the total price charged for the entire package was noncompetitive. It would not be sufficient for each franchisee to accept the good buys in the package and to reject the balance. *See Siegel v. Chicken Delight, Inc., supra* at 52–53.

Assuming that plaintiffs could show that advertising was a separate product from the trademark for purposes of a tying claim,[2] proof 'of fact of damage would be elusive. Plaintiffs have not suggested how the individual franchisees might have used their advertising dollars more efficiently.

An individual franchisee will have a considerable task to show damage in view of the fact that BRICO invested seven times the total contribution of store owners in advertising during 1975, the last year of the penny-per-gallon program.

In sum, the tying claim as to ice cream products is certifiable. The claims as to store leases, equipment, supplies and adver-

tising pose individual questions which predominate over common questions and which threaten to render the entire action unmanageable.

**2. Price-Fixing:**

Plaintiffs allege that BRICO, its subsidiaries, and its area franchisors conspired among themselves and with various suppliers and distributors to fix the wholesale prices at which ice cream products, the equipment package and other supplies were sold to the franchisees. To prove such a price-fixing allegation, plaintiffs must show: (1) an agreement to set prices at a noncompetitive level, (2) fact of damage, and (3) quantum of damage. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Windham v. American Brands, Inc., supra*, 565 F.2d at 59.

As noted in *In re Sugar Antitrust Litigation*, 1977–1 Trade Cases ¶ 61,373 at 71,329 (N.D.Cal.1977) class action petitions on wholesale price-fixing claims have generally been given favorable treatment.

"Courts have consistently held that antitrust price-fixing conspiracy litigations, by their nature, involve common legal and factual questions concerning the existence, scope and effect of the alleged conspiracy."

The only instances in which courts have refused to certify price-fixing cases are those in which proof of the conspiracy as to numerous defendants cannot be accomplished on a classwide basis[3] or when proof of fact of damage would be unmanageable because of the intricate nature of the market or the number of potential plaintiffs.[4]

It appears that proof of the conspiratorial agreement to fix prices in the sale of ice cream products at its most complex, would

---

**2.** *But see Kugler v. Aamco Automatic Transmissions, Inc.*, 460 F.2d 1214, 1215–16 (8th Cir. 1972) (advertising is not a separate product from trademark for purposes of a tying claim).

**3.** *See Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) (proof of knowledge of circular by real estate broker's association by over 400,000 individual broker defendants nec-

essary to establish conspiracy as to each defendant).

**4.** *See Windham v. American Brands, Inc., supra* (sales of flue-cured tobacco at 36 different auction centers with fluctuating price of commodity and complex variable grading system unmanageable); *In re Hotel Telephone Charges, supra*, (class of plaintiffs 40 million).

involve only nine agreements and proof of a common objective. Proof of fact of damage as to the price-fixing claim of ice cream products would not be sufficiently complex to justify the *Windham* type exception. It may be possible to prove fact of damage as to ice cream products by relating increases in prices to increases in costs for each of the area franchisors. If this type of common proof does not work, then individualized proof of the competitive prices in each ice cream product market may be necessary. The Court feels such proof, though cumbersome, will still be within the limits of manageability.

■ The price-fixing claims as to equipment and supplies are not certifiable. As to each of these claims, proof of fact of damage would introduce complexity of the magnitude threatened in *Windham* because of the number of products and the number of alleged co-conspirators involved.

3. *Resale Price Maintenance:*

■ Plaintiffs allege that BRICO and the area franchisors conspired to fix the maximum price at which the franchisees could sell ice cream products. The crucial element of a resale price maintenance claim is an agreement between a manufacturer and the retailer to restrict the resale price to a maximum level. *Santa Clara Valley Dist. Co. v. Pabst Brewing Co.*, 556 F.2d 942 n. 3 (9th Cir. 1977). That agreement may be demonstrated by contract or by a course of conduct. In the absence of a contractual term evidencing the retailer's commitment to maintain prices, there must be a showing that the retailer's participation was involuntary for the scheme to be actionable. *Gray v. Shell Oil Co.*, 469 F.2d 742, 747–48 (9th Cir. 1972). As stated in *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1357 n. 4 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977):

> "[A] supplier may suggest retail prices to its dealers and use 'persuasion' to get them to adopt the suggested prices. No violation is made out unless plaintiff can show that the supplier's conduct rose to the level of coercion sufficient to deprive the dealers of their free choice."

■ Plaintiffs claim that the resale price maintenance program was conducted by the area franchisors through indirect restrictions on the store owners in the Store Franchise Agreement. The Agreement provides that store owners may post only those signs supplied by the company. Among the approved signs are price stickers designed to be affixed on the wall behind the ice cream counter. Along with the list of suggested retail prices which the store owner is supplied from time to time, the new franchisee is given the back board with the price stickers already affixed. Plaintiffs have adduced testimony that some franchisees were not given any price stickers in addition to those initially affixed to the back board and that they were denied permission to raise their retail prices above the suggested prices.

It appears that any resale price maintenance practices that might have existed were limited to the McDonald area in Michigan. Other than in Michigan, there was little price uniformity among franchisees in the same franchise area. The alleged price-sticker resale price maintenance scheme is not sufficiently direct or convincing proof of coercion to obviate an individual showing of coercion as to each franchisee. Individual questions predominate in the proof that is expected on this claim. *See Chicken Delight, Inc. v. Harris*, 412 F.2d 830 (9th Cir. 1969).

4. *Territorial Market Division Claim:*

In presenting this motion, plaintiffs have introduced a claim that was not stated in the first amended complaint—that defendants violated the antitrust laws by horizontal market division. Plaintiffs stated at oral argument that they would move to amend their complaint to include this claim. Conditioned upon the success of that motion, the Court will consider the certifiability of this claim.

The essence of the claim is that the Baskin-Robbins franchise system which divides the country into nine different regions and appoints each area franchisor as the exclu-

sive supplier of ice cream products in his region violates § 1 of the Sherman Act.

Defendants contend that the territorial market division is vertical in character and that such agreements are governed by the "Rule of Reason." *Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Defendants argue that proof under a Rule of Reason test would necessarily be so individual as to each alleged restriction that class procedures would be unmanageable. The Court need not decide whether individual questions would predominate under a Rule of Reason test since the challenged territorial restriction is horizontal in nature.

■■■■■ Horizontal restrictions on competition are per se illegal. This includes territorial market allocations between competitors, *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) and territorial market allocations as part of a franchising system when the allocatur is controlled by the franchisees, *United States v. Sealey, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Defendants contend that *Sealey* and the similar holding in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) are inapposite since the area franchisees do not own or control BRICO and it is BRICO that makes the territorial allocations. If BRICO were the franchisor and nothing more, this system would indeed be vertical. *Tomac, Inc. v. The Coca Cola Co.*, 418 F.Supp. 359 (C.D. Cal.1976). BRICO is not, however, strictly a franchisor. It is connected to the manufacture and supply of Baskin-Robbins ice cream products through its subsidiary, Baskin-Robbins, Inc. which is the area franchisor for much of the country. An entity occupying such a dual role is forbidden per se from imposing territorial market restrictions. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1254 (5th Cir. 1975). In the latter case, Holiday Inns, Inc. was acting both as a franchisor of its trademark and as an operator of inns. The Court found that restrictions in its franchise agreements prohibiting franchisees from establishing competing Holiday Inns or competing non-Holiday Inns in cities in which Holiday Inn, Inc. operated an establishment, unless done, with Holiday Inn, Inc.'s permission, constituted market allocation agreements among competitors and was per se illegal. Except for the absence of a clause waiving the territorial restrictions on the area franchisors with BRICO's permission, the territorial allocation provision of BRICO is indistinguishable from that of Holiday Inn.

■■■■ The only possible individual issue with reference to the horizontal territorial restriction claim is fact of damage. Plaintiffs may be able to show fact of damage as to this claim by demonstrating that a neighboring area franchisor is a potential competitor. If it could be shown that a neighboring area franchisor had sufficient capacity to handle excess demand at lower prices, fact of damage would be proven. If transportation problems do not prevent such a showing, proof of fact of damages could be relatively mechanical. Even if fact of damage must be demonstrated by other means, the showing will be no more involved than that required to prove the price-fixing or tying claim as to ice cream products. The horizontal market division claim, if appropriately pleaded, is certifiable.

5. *Fraudulent Concealment Claims:*

■■■■ Private treble damage actions under § 4B of the Clayton Act have a statute of limitations of four years. 15 U.S.C. § 15b. In order to assert claims arising prior to the four year limit, plaintiffs must show fraudulent concealment. In this regard, the following elements are required to prove fraudulent concealment: (1) that plaintiff failed to discover facts suggesting a possible claim until within four years of the filing of the complaint; (2) that due diligence on his part would not have uncovered such facts earlier; and (3) that his failure to discover such facts was attributable to affirmative acts of fraud perpetrated by defendants. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

It is apparent from consideration of these requirements that they require individualized proof as to the state of mind of each claimant, the ability of each claimant to have uncovered the fraud, and that extent of each claimant's efforts in doing so. Although the predominance of individual questions presented by fraudulent concealment claims have been ignored in some price-fixing cases, *In re Sugar Industry Antitrust Litigation, supra,* at 71,338, less zealous courts have denied class certification to claims dependent on proof of fraudulent concealment. *See e. g. Chmieleski v. City Products Corp.,* 71 F.R.D. 118, at 160 n. 38 (W.D.Mo.1976); *Chevalier v. Baird Savings Assoc.,* 72 F.R.D. 140, 153–54 (E.D.Pa.1976). This Court views the latter position as the more honest reading of the requirements of Rule 23 and the statute of limitations. Since the statute commences running upon the last overt act in furtherance of the conspiracy, (*see Manok v. Southeast District Bowling Ass'n.,* 306 F.Supp. 1215, 1221 (C.D. Cal.1969)) any claims based on actions prior to June 4, 1972 are not susceptible to class treatment.

In connection with the topic of fraudulent concealment, separate treatment of defendant Southland Corp. is in order. Southland sold out its interest as an area franchisor to BRICO in December of 1971. Southland claims that it terminated its participation in the Baskin-Robbins system at that time, and therefore could not have been part of conspiratorial activities that might have been undertaken after 1972. Plaintiffs contend, on the other hand, that the sale of Southland's interest in the Baskin-Robbins franchise system did not terminate Southland's involvement with the system. It points out that releases of liability were not obtained and that Southland allegedly contracted with BRICO to continue to sell ice cream for one year. The details of this latter agreement are not clear, but plaintiff has not shown that Southland retained its status as an area franchisor.

Southland should be excluded as a defendant in any of the class proceedings. Any claim against Southland arising while it was an area franchisor would not be certifiable because fraudulent concealment would have to be shown. Any liability based upon Southland's role during 1972 would raise issues that were not typical to the class since Southland was not acting in the capacity of an area franchisor.

### C. *23(b)(3): Superiority of a Class Action*

The Court is persuaded that the relative superiority of class treatment of these claims exists only insofar as the trial of these claims will be manageable. Both sides have attempted to impress upon the Court other factors that should be weighed in this analysis. Plaintiffs have argued that this is the only court in which venue can be obtained over all defendants. Defendants have countered that these claims need not be entertained as a class action since the plaintiffs have each professed a willingness to continue this action on an individual basis if necessary. Both of these contentions have some moment.

Nevertheless, the overriding consideration in evaluating the method of proceeding that would be most efficient in this case is manageability. The determinations that the prerequisites of 23(a) have been met and that common questions predominate are tantamount to a preliminary conclusion that class treatment is more efficient than other methods of proceeding. If the scope of what remains is manageable, class certification ought to follow. As has been discussed *supra,* the tying and price-fixing claims as to ice cream products and the horizontal market division claim are all manageable as a class action.

IT IS HEREBY ORDERED, that a class composed of all parties owning an interest in a Baskin-Robbins ice cream store franchise at any time since June 4, 1972 be certified against those defendants named in the amended complaint, with the exception of the Southland Corp., as to alleged violations of § 1 of the Sherman Act and § 3 of the Clayton Act by tying sales of ice cream products to the sale of Baskin-Robbins trademark, and by conspiring to fix the

wholesale price of Baskin-Robbins ice cream products. In addition, the foregoing class is certified as to the alleged horizontal territorial market allocation claim, conditioned upon the amendment of plaintiffs' complaint to include such an allegation. Certification is denied as to all other claims, including: the tying claims as to store leases, equipment, supplies and advertising; wholesale price-fixing claims as to equipment and supplies; and the resale price maintenance claim.

IT IS FURTHER ORDERED THAT on or before March 20, 1978 counsel for the class representatives shall file with the Court and serve upon defendants a proposed form of class notice in accordance with Moore's Federal Practice, Manual for Complex Litigation, § 1.45, including a listing of class members, the last known address of each member, the dates during which his franchise was operated, and the area franchisor with whom he did business. On or before April 3rd, 1978 counsel for defendants may file and serve memoranda of objections to or modifications of the notice proposed by plaintiffs. On or before April 10th, 1978, counsel for the class representatives may file and serve a reply memorandum. IT IS SO ORDERED.