**Richard CASH, d/b/a Cash's Arctic Circle et al., Plaintiffs,**

**v.**

**ARCTIC CIRCLE, INC., a Utah Corporation, Defendant.**

**Civ. No. C–77–221.**

United States District Court, E. D. Washington.

Dec. 14, 1979.

(23.1 and Section 327) require shareholder status at the time of the suit.

Paul A. Bastine & Roger A. Coombs, Bastine & Coombs, Spokane, Wash., for plaintiffs.

James P. Connelly, Winston & Cashatt, Spokane, Wash., for defendant.

## MEMORANDUM AND ORDER RE MOTION FOR RECONSIDERATION

SPENCER WILLIAMS, District Judge, Sitting by Designation.

Plaintiffs are or in the past have been franchisees of defendant Arctic Circle, Inc. They bring this antitrust action alleging they have been subjected to illegal tying arrangements by defendant in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), and the Washington Franchise Investment Act, Wash. Rev.Code § 19.100.180. Plaintiffs have now moved for reconsideration of this court's order of August 28, 1978, denying their motion to maintain this action as a class action. This matter has been submitted to the court on the papers without oral argument.

The two classes which plaintiffs seek to have certified by this motion to reconsider are narrower than the class originally proposed and which was the subject of this court's earlier ruling.[1] First, there is a proposed class consisting of all franchisees

---

1. The class originally proposed consisted of all past and present Arctic Circle franchisees and joint venturers who have been required to purchase goods and services from defendant and other suppliers at uncompetitive prices. Additionally, plaintiffs requested two subclasses comprised of (1) those franchisees and joint venturers who have been required to lease property from defendant, and (2) those franchisees and joint venturers who have been required to purchase and participate in accounting services furnished by defendant.

and joint venturers who, during the applicable limitations period (since August 1, 1973), allegedly have been subject to an express contractual tie of syrups and toppings to the Arctic Circle trademark. Second, there is a proposed class consisting of all franchisees and joint venturers who, during the applicable limitations period (since August 1, 1973), allegedly have been subject to an express contractual tie of accounting services to the Arctic Circle trademark.

Plaintiffs seek to maintain each of the proposed classes pursuant to Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) requires that common questions of fact and law predominate over individual questions, and that the court determine that a class action is superior to other available means of litigating these claims. For the reasons discussed below, neither of these two criteria is satisfied by either proposed class.

## I

### THE SYRUPS AND TOPPINGS TIE

A. *Common Questions Do Not Predominate*

1. *Existence of the Tying Arrangement and Coercion*

■ Two related elements plaintiffs must prove to establish a prima facie case of a per se illegal tying arrangement are the existence of the tying arrangement itself and a modicum of coercion. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212, 1216–17 (9th Cir. 1977). Ordinarily, these issues would involve questions of fact which would have to be reviewed separately as to each plaintiff. Where, however, the tie is incorporated into an express written agreement, coercion is implied. *See Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 118 (C.D.Cal.1978). In the absence of an express agreement, a Rule 23(b)(3) class action is rarely appropriate in illegal tying cases because the questions of the existence of the tie and of coercion would require individualized fact-finding, and common questions of fact and law could not be said to predominate. *See Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1226

(3d Cir. 1976); *Smith v. Denny's Restaurants, Inc.*, 62 F.R.D. 459, 461–62 (N.D.Cal. 1974). It was largely for this reason that plaintiffs' first motion for class certification was denied.

■ Seeking to avoid these problems, the first of the newly proposed classes consists of those franchisees, past and present, who have been subject to an *express* contractual obligation to purchase syrups and toppings from defendant. Nevertheless, even though this limited class might not be inappropriate for certification on the ground that individual questions predominate with respect to proof of the tie's existence and coercion, other factual and legal determinations remain which are likely to require intense scrutiny of individual franchisees and local markets, as is discussed in the next two subsections of this opinion.

2. *Economic Power*

■ Another essential element of a prima facie case of per se illegal tying is that the defendant possess sufficient economic power in the tying product "to appreciably restrain free competition in the tied product markets." *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 49 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). This determination ordinarily involves a question of fact focusing on the uniqueness and desirability of the tying product. Where the tying product is patented or copyrighted, however, the law has imparted protection from competition as a means of rewarding, and thereby encouraging, creativity. In these instances, uniqueness is the intended result of a statutorily-granted monopoly. For this reason, where the tying product is patented or copyrighted, economic power with respect to the possibility for tying is presumed. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (copyright); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (patent).

The alleged tying product used by defendant here is its franchise agreement—or,

in other words, its trademark. The uniqueness of registered trademarks, like that of copyrighted and patented products, enjoys a measure of protection by the law. In *Siegel*, the Ninth Circuit referred to the rule for patents and copyrights in ruling that the Chicken Delight trademark would be presumed to have the requisite economic power. 448 F.2d at 50–51. Likewise, plaintiffs here wish the court to presume that the Arctic Circle trademark possesses the requisite economic power in each of the localities in which putative class members are located.

The *Siegel* decision has been harshly criticized in other courts, and there is some authority (though, to be sure, not too many courts have faced this problem) holding that the *Siegel* ruling must be read narrowly. *See, e. g., Esposito v. Mister Softee, Inc.*, 1976–2 Trade Cases ¶ 61,202, at 70,478–79 (E.D.N.Y.1976); *cf. Krehl*, 78 F.R.D. at 120 ("[T]he criticisms of a broad reading of *Siegel* are cogent . . . ."). Instead of interpreting *Siegel* as erecting a presumption of economic power upon a finding that the tying product is a protected trademark, the narrower view is that *Siegel* actually turned on the fact that the evidence in that case had established that Chicken Delight's particular trademark "is distinctive; that it possesses good will and public acceptance unique to it and not enjoyed by other fast food chains." *Siegel*, 448 F.2d at 50. This view comports with the underlying purposes of the trademark laws as opposed to those of the copyright and patent provisions. It must be remembered that the very goal of the patent and copyright laws is to confer market power upon those who have created unique products through the application of inventiveness and imagination. In contrast, trademark laws are not designed to induce creative works by the promise of government-protected monopolies, and market power in the trade name is not their aim. Rather, trademark protection is afforded to prevent piracy of trade names, by which competitors might otherwise capitalize on and perhaps damage another's good will as well as confuse and perhaps defraud consumers. The Supreme

Court has never recognized the existence of a presumption of economic power with respect to trademarks, and this court has concluded such a presumption would be misplaced. In this court's opinion, *Siegel* should not be read to declare a ̇*per se* rule; the better view is that evidence of uniqueness and desirability, not a legal presumption, justified the directed verdict in that case.

The narrow view of *Siegel* is not only consistent with the facts and holding of *Siegel* itself, but it is also consistent with recent Supreme Court decisions making it clear that the determination of economic power is a question of fact. *See, e. g., United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 619–22, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*). In *Fortner II*, the Court reiterated its view that patent monopolies and copyright monopolies, which are granted by statute, result in sufficiently unique products that as tying products they will be presumed to possess economic power, but the test in most other instances was stated by the Court as follows: " 'If the price [of the tying product] could have been raised but the tie-in was demanded in lieu of the higher price, then—and presumably only then—would ̇ the requisite economic power exist'." *Id.* at 620 n. 13, 97 S.Ct. at 868 n. 13 (quoting Dam, 1969 Supreme Court Review 25–26).

The matter of economic power is a jury question unless the evidence would warrant a directed verdict. *Siegel* was a directed verdict case, and the verdict could be justified by the preeminence of the Chicken Delight trademark. Nationwide preeminence was also found in *Krehl*, thereby establishing sufficient economic power as a matter of law under the narrow reading of *Siegel* adopted here. 78 F.R.D. at 120. No comparable evidence has been submitted in this case. Plaintiffs have to date submitted insufficient evidence to rule as a matter of law that economic power existed anywhere, let alone across the entire multi-state area in which franchisees are located. Moreover, there is no indication that plaintiffs would ever be able to present adequate evidence

to be entitled to the *Siegel* -type of directed verdict. Without evidence that defendant possessed the requisite economic power throughout its range, individualized proof pertaining to each locality will be required. Consequently, it appears that individual questions pertaining to proof of economic power will predominate, and the court is therefore unable to find that the first requirement of Rule 23(b)(3) is met in this case.

### 3. The Fact of Damage

■ As part of their prima facie case, plaintiffs must not only prove that there is an illegal tie, but also that there actually were damages sustained. *See Ungar,* 531 F.2d at 1224 n. 11. The fact of damage must be proven by showing "that alternate sources of comparable quality [syrups and toppings] would have been available, but for the tie." *Krehl,* 78 F.R.D. at 120. Following the approach taken in *Krehl,* plaintiffs propose that the fact of damage could be shown here by reference to regional prices available to chains comparable to Arctic Circle. *Krehl* recognized that establishing the fact of damage over widespread territories would be difficult, and might turn on localized issues of proof. *Id.* The court theorized, though, that Baskin-Robbins was so big that competitors in the tied product, wholesale ice cream, probably would have region-wide prices. Even if region-wide prices were not available, the court felt that the discrete product line involved with its "relatively stable prices" would make individualized or localized matters of proof manageable. *Id.*

Although plaintiffs here have suggested that prices charged to competitors could be used without great difficulty to establish the fact of damage, they have failed to demonstrate a sufficient likelihood that competition in syrups and toppings is region-wide or that these are products with relatively stable prices for this court to be persuaded that application of the *Krehl* approach would be feasible. The current state of the record is such that the court can only guess about how burdensome, pre-dominating and unmanageable the individual questions of fact on this issue would be. Pricing in the northwest markets in which Arctic Circle franchises are located may well turn out to be a very highly localized matter.

Inasmuch as plaintiff bears the burden of establishing satisfaction of the Rule 23 prerequisites to class treatment, the court must conclude that, as to this issue too, predominance of common questions has not been shown.

### B. Class Treatment Is Not Superior To Other Available Means Of Adjudication

Even if the common questions requirement had been satisfied, class action treatment of the syrups and toppings tie claim would only be appropriate under Rule 23(b)(3) if plaintiffs had established that a class action would be superior to other available means of litigating this claim. This they have failed to do.

Because important matters regarding economic power and the fact of damage will revolve around facts peculiar to a number of different geographic regions, concentration of the litigation in one district would not prove easy to manage. The task of the fact finder in such a case would be difficult, and the risk of confusion greatly increased. In addition, class treatment would result in litigation which is unnecessarily protracted as to each individual plaintiff, who must stand by idly during presentation, argument, and resolution of numerous complicated questions irrelevant to his particular claim. On the other hand, because of the overwhelming presence of complicated questions of fact concerning economic power and the fact of damage, members of the proposed class could litigate in individual actions without significant, if any, sacrifice of whatever judicial economy might have resulted from class action treatment here. Also, the likelihood that individual actions would be filed in or could be transferred to districts in which witnesses and evidence relevant to the complex regional issues are located argues in favor of separately instituted suits.

If appropriate, individual actions might be multi-districted for consideration of pretrial issues common to all, and then returned to the districts of their filing for ultimate resolution of individual questions. But the existence of some common issues does not overcome the difficulties which maintaining this action as a class action would entail for the court, the defendant, and the individual class members themselves. In short, even if the court had not found that common questions do not predominate, the apparent superiority of individual actions on this claim would have required denial of plaintiffs' motion.

## II

### THE ACCOUNTING SERVICES TIE

A. *Existence Of The Tying Arrangement And Coercion: Predominance Of Individual Questions*

The second class proposed by plaintiffs, like the first, is based on an allegedly express tie, one involving accounting services. Unlike the syrups and toppings tie, however, the actual existence of this alleged tying arrangement is not clear from the language of the franchise agreement itself. Defendant argues with some force that the accounting services provision is nothing more than a covenant that the franchisee will purchase such services from defendant. Defendant points out that explicit contractual language provides that the right and license to be a franchisee "shall continue *only so long as* the licensee shall purchase his full requirements of Arctic Circle or designated brands toppings and syrups from the licensor." (Emphasis added.) No comparable provision exists with respect to the accounting services, and on its face it would appear that failure to purchase those services from defendant would constitute a breach which would not automatically cancel the entire agreement.

Plaintiffs contend, however, that testimony will show that certain franchisees were instructed that unless they did comply with the accounting services provision, they would be terminated. This argument is tantamount to an admission that an *express* tying arrangement does not exist. Individualized proof would be required on this issue, it would predominate over common questions involved in this claim, and class status is therefore inappropriate.

B. *Other Considerations Warranting Denial Of Class Treatment*

Even assuming an express tie to accounting services existed, class status would be inappropriate. The tying product, defendant's trademark, is, of course, the same for both proposed classes. As is detailed above, plaintiffs have not successfully rebutted the likelihood that the issue of this product's economic power involves a predominance of individualized questions dependent upon the geographic location of a class member's franchise outlet. As for the question of the fact of damage, the reasoning of *Krehl* with respect to region-wide competition, discreet product lines, and stable markets is even less applicable to the alleged accounting services tie than it might have been to the syrups and toppings tie. The court in *Krehl* itself denied certification with respect to a tie to store leases because the required "case by case comparison . . . would bury th[e] Court in a consideration of intangibles." 78 F.R.D. at 121. Finally, for the same reasons class treatment would not be the superior means of adjudicating the claim of an illegal syrups and toppings tie, it would not be the superior means of adjudicating the claim of an illegal accounting services tie.

## III

### ORDER

For the foregoing reasons, it is hereby ordered that this action may not be maintained as a class action, and that plaintiffs' motion for reconsideration is denied.