**PITCHFORD SCIENTIFIC INSTRUMENTS CORPORATION, Plaintiff,**

v.

**PEPI, INC., North American Philips Corporation, and Philips Electronic Instruments, Inc., Defendants.**

**Civ. A. No. 70–1461.**

United States District Court,
W. D. Pennsylvania.

July 13, 1977.

---

Clayton A. Sweeney, Pittsburgh, Pa., for plaintiff.

Paul H. Titus, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

Following a lump sum verdict of $825,000 for plaintiff in an antitrust triple damage suit under 15 U.S.C. §§ 1 and 15, the Court of Appeals concluded that damage to plaintiff arising from price-fixing, exclusive dealing, and full-line forcing had not been sufficiently proved, and remanded for further proceedings to determine the "amount of damage in connection with the territoriality count." *Pitchford v. Pepi,* 531 F.2d 92, 111 (C.A.3, 1976). See also *ibid.,* 101–105. The facts of the case are sufficiently stated in the thorough opinion of the Court of Appeals, and need not be repeated here, as we are now concerned only with a question of law: namely, whether the opinion and mandate of the Court of Appeals are consistent with, or conflict with, the subsequent decision of the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania Inc.,* —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568, decided June 23, 1977.[1]

Five days later, upon defendant's petition to recall the mandate and stay the retrial as to damages, the Court of Appeals denied the relief sought, holding that the District Court should make the initial determination with respect to the issue of inconsistency. The Court of Appeals said:

> If in fact the mandate of this Court is in conflict with a subsequent decision of the Supreme Court, the rule announced by the Supreme Court, rather than the mandate of this Court, will be the appropriate rule and should be followed by the district court. The controlling effect of the mandate from a higher to a lower court is an application of the law of the case doctrine, and that doctrine yields to the authority of a source of law higher than that of the court which issued the mandate. See *Banco Nacional de Cuba v. Sabbatino,* 383 F.2d 166 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968).

Stated generally, the *Continental T.V.* case overruled *U. S. v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and reverted to the standards of *White Motor Co. v. U. S.,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), where "the Court had refused to endorse a *per se* rule for vertical restrictions." [—— U.S. at ——, 97 S.Ct. at 2556]. The Court abandoned reliance upon the "witty diversities of the law of sales"[2] with respect to transfer of title as the criterion of whether to apply a *per se* rule, in favor of "demonstrable economic effect," with the result that both sale and non-sale transactions are to

---

1. This decision affirmed *GTE Sylvania Inc. v. Continental T.V., Inc.,* 537 F.2d 980 (C.A.9, 1976), in which the Ninth Circuit Court of Appeals utilized the unusual opportunity to reverse a retired Supreme Court Justice, the late Tom C. Clark, sitting by designation as the trial judge in the Northern District of California. *Ibid.,* 987.

2. Justice Holmes in *Rearick v. Pennsylvania,* 203 U.S. 507, 512, 27 S.Ct. 159, 160, 51 L.Ed. 295 (1906), said that " 'Commerce among the several States' is a practical conception, not drawn from the 'witty diversities' (Yelv., 33) of the law of sales."

be judged under the "rule of reason" in case of non-price vertical restrictions.[3]

One dangerous consequence of the decision is the possible impetus given to potential erosion of the *per se* ban on price-fixing. As Judge Browning pointed out in his cogent dissenting opinion: "Indeed, 'any argument that can be made on behalf of exclusive territories can also be made on behalf of resale price maintenance.'" 537 F.2d at 1019. And Mr. Justice White observes in his concurring opinion that "the economic arguments in favor of allowing vertical nonprice restraints generally apply to vertical price restraints as well." —— U.S. at —— and note 10, 97 S.Ct. at 2568, as well as note 18 of the majority opinion at —— U.S. ——, 97 S.Ct. 2549.

Vertical restrictions may be understood as those imposed by agreement between a manufacturer and a distributor or dealer, where the parties occupy a different rank in the hierarchy of distribution. Horizontal restrictions may be understood as those imposed by agreement between parties of the same rank or level in the system of distribution.

*A priori* one would have supposed that this was a factitious and unprofitable distinction; that if a contract or agreement between two parties operated to restrain trade it would not matter what position either of them occupied in the distribution system. However, the distinction is recognized as very important and controlling by the Supreme Court in the *Continental T.V.* case. One would also have supposed that the transfer of title test affords a simple and workable rule, based on the fundamental distinction between *meum* and *tuum*. One's power to do what he will with his own (see Mt. 20:15) would seem quite different from his power to do what he will with the property of someone else.

Strangely, the Court does not cite at all two landmark cases, *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), and *U.S. v. General Electric Co.,* 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), which are mentioned only in Mr. Justice White's concurring opinion. And *Addyston Pipe,*[4] the *fons et origo* of the law on price-fixing, division of customers, and allocation of territory, is entirely overlooked in all the opinions.

Hence it is probable that the *Continental T.V.* case will produce as much confusion and controversy as the *Schwinn* case which it superseded.[5] A full discussion of the subject, frequently cited in the *Continental T.V.* case, is contained in the American Bar Association Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition. It is likely that the long-continuing controversy on this topic which as there said (p. 98) "goes to the very heart of antitrust policy," will not be forev-

3. The classical explanation of the reasons for establishing a *per se* rule as an exception to the rule of reason is given by the late Mr. Justice Black in *Northern Pacific Co. v. U. S.,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):
    However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been un-

reasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 46 L.R.A. 122, aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

4. *Addyston Pipe and Steel Co. v. U.S.,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

5. For the literature on *Schwinn* to which the Court adverted, see note 13 of its opinion.

er laid to rest by the impact of the Supreme Court's latest pronouncement.

For present purposes, however, we must accept *Continental T.V.* as the *dernier cri* on the subject-matter involved, scrutinize carefully its scope, and see how it squares with the views of the Court of Appeals.

Careful examination of the Supreme Court's *Continental T.V.* decision and the opinion of the Court of Appeals in the case at bar reveals no inconsistency or conflict which would warrant departure from the mandate of the latter court to proceed with trial of the issue of damages under the territoriality count. This conclusion is supported by a number of reasons:

1. The *T.V.* case deals only with vertical restrictions. The Supreme Court opinion speaks of such restrictions *passim*. In note 18, for example, it is said: "As in *Schwinn*, we are concerned here only with nonprice vertical restrictions." In the last paragraph of the opinion the Court says: "In sum, we conclude that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to *Schwinn*." In note 28 the Court says: "There is no doubt that [horizontal] restrictions . . . would be illegal *per se*," citing cases.

In the case at bar, however, the Court of Appeals found that the evidence established a *horizontal* restraint, which would be a violation *per se* without regard to the *Schwinn* rule. "In the present case . . . the record reveals an explicit agreement between PEI and each dealer to divide territories. Thus a horizontal restraint, a *per se* violation of the Sherman Act, could be found on this record, even if the *Schwinn* prohibition of vertical restraints were not dispositive." 531 F.2d at 104.

2. The *T.V.* case dealt only with a "location" clause, similar to that approved in *Kaiser v. General Motors Corp.,* 396 F.Supp. 33, 39–41 (E.D. Pa. 1975), aff'd 530 F.2d 964 (C.A. 3, 1976).[6]

At the very beginning of Mr. Justice Powell's opinion, he speaks of franchise agreements "barring retailers from selling franchised products from locations other than those specified in the agreements," and goes on to say that the *Continental T.V.* case "presents important questions concerning . . . *these* restrictions." [Italics supplied].

It appears clearly from the Ninth Circuit opinion that the Sylvania restriction was a *vendor* restriction and not a *vendee* restriction; that "each Sylvania dealer was *free to sell to any buyer he chose* " from his authorized location. 537 F.2d at 990.

In violation of the purely locational restriction in that case, Continental did not merely seek to sell from its San Francisco location to customers located elsewhere, but opened a new (unauthorized) location in Sacramento to which it moved Sylvania merchandise. 537 F.2d at 984–85.

In the case at bar, however, the effect of the territorial restriction is to forbid sales to customers located outside the dealer's assigned territory. This is in fact a *vendee restriction* rather than a mere *location restriction*. Pitchford had its location in Pittsburgh, where the central office of U.S. Steel is located, and by reason of good relations with that corporation's headquarters personnel, sought to make, and doubtless could have made in the absence of defendant's restrictive practices, sales from the Pittsburgh location of Pitchford territory.

The economic impact of defendant's restrictions was thus more serious than that of the purely locational restrictions involved in the *T.V.* case.

3. The *T.V.* case dealt with a location restriction standing alone, and unconnected with a price-fixing plan. The jury had expressly so found. The jury answered "No" to the question whether Sylvania had engaged in "location restrictions and price fixing as an integral part of a single distribution policy;" and "Yes" to the question whether *Sylvania* had violated the antitrust laws "with respect to locations restrictions alone." 537 F.2d at 985–86.

6. Cited in note 11 of the *T.V.* opinion.

The Supreme Court emphasized that the jury found that Sylvania had violated the antitrust laws "with respect to location restrictions alone." In note 9 the Court commented: "Most important was the jury's rejection of the allegation that the location restriction was part of a larger scheme to fix prices."

As quoted above in connection with point 1, note 18 of the *T.V.* opinion emphasizes that "we are concerned here only with *non-price* vertical restrictions." [Italics supplied].

In the case at bar, however, it is manifest that defendant's territorial restrictions were part and parcel of a comprehensive price-fixing policy. In the apt words of Judge Wisdom in *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 948 (C.A. 5, 1975), the defendants' restraints "were ancillary to an illegal price fixing scheme." Even on a printed record, without being able to see defendant's vice-president in charge of sales attempt to foist the blame for distribution of price directions to dealers upon the mailing clerk, (Tr. 2620–24) the Court of Appeals squarely found that the evidence supported a finding of price-fixing. 531 F.2d at 98.

The fact that plaintiff failed to prove loss or damage attributable to the price-fixing violation[7] (*ibid.,* at 99) does not detract from the integration of price-fixing and territorial restrictions characterizing the defendant's sales practices of which both types of restraint formed part and parcel.

4. Finally, even if in the case at bar the Court had not mentioned *Schwinn* at all[8] or had tried the case under the *T.V.* rule of reason, the outcome would have been no different, and from the practical standpoint no harm has been suffered by defendant by reason of the trial court's failure to anticipate the overruling of *Schwinn* by the *T.V.* case. Any error (in the light of hindsight) committed is harmless.

This is true because in fact the trial court permitted defendants to offer all the testimony which they desired to present in order to show that the territorial restrictions which they included in their dealer contracts were in fact reasonable, and were justified by the nature of the product, its danger to the public if not properly operated, and the need for expert service.[9]

It would be difficult to imagine any significant new evidence which defendants could adduce under the rule of reason if a new trial were had. Doubtless the resourcefulness and ingenuity of counsel could come up with something, but it is extremely doubtful whether the additional evidence would be of sufficiently substantial character to warrant a new trial in a protracted antitrust case.

At the previous trial the jury specifically negated defendant's rule of reason defense by answering "No" to the interrogatory: "Were legitimate business reasons (such as poor performance) a predominantly contributing factor to termination of Pitchford Scientific Instruments Corporation's dealership on September 10, 1970?"

For the foregoing reasons the *T.V.* case does not appear to be applicable to the case at bar in such a manner as to conflict with the rulings of the Court of Appeals in the case at bar or to warrant suspension of the mandated trial with respect to the amount of damages under the territoriality count.

---

7. There was little evidence that Pitchford was a "price-cutter" and would have sold at a lower price if free to do so. The only instance of a price concession which comes to mind is that of a sale to a hospital in 1969 (see 531 F.2d at 98) where defendants finally absorbed much of the reduction in the guise of a donation to the hospital (which would now be described as "laundered money") and the inviolability in principle of the fixed list price was maintained.

8. *Schwinn* was mentioned only peripherally and incidentally in the charge when discussing price-fixing. All that the Court said was: "Another refinement, which we don't need to go into here, is another recent Supreme Court case about bicycles. The name of that company was Arnold Schwinn." Tr. 3230.

9. Defendants were doubtless seeking the benefit of a holding such as that in *Tripoli Co. v. Wella Corp.,* 425 F.2d 932, 936–39 (C.A. 3, 1970), or *U.S. v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 557 (E.D. Pa. 1960).

Accordingly, defendant's motions are denied, and the trial shall continue.