[Civ. No. 42953. First Dist., Div. Four. Jan. 29, 1980.]

GUILD WINERIES AND DISTILLERIES, Plaintiff,
Cross-defendant and Respondent, v.
J. SOSNICK & SON, Defendant, Cross-complainant and Appellant.

Counsel

Frederick P. Furth, Thomas R. Fahrner, Richard S. E. Johns, Michael P. Lehmann, Furth, Fahrner & Wong and Furth, Fahrner, Bluemle, Mason & Wong for Defendant, Cross-complainant and Appellant.

Godfrey L. Munter, Jr., John A. Hinman, Robert W. Martin, Martin, Munter & Keegin and Martin & Munter for Plaintiff, Cross-defendant and Respondent.

Opinion

**BRUNN, J.*—(1a)** This is a Cartwright Act private antitrust case. We hold that it is unlawful for a manufacturer who also distributes its own products in one geographic area to terminate an independent distributor when a substantial factor in bringing about the termination is the distributor's refusal to accept the manufacturer's attempt to enforce or impose territorial or customer restrictions among distributors. We reverse a judgment in favor of the manufacturer because of instructions to the jury inconsistent with this principle.

I

Guild Wineries and Distillers (hereinafter Guild) sued J. Sosnick & Son (Sosnick) seeking monies due for liquor which Guild had sold Sosnick. Sosnick filed a cross-complaint alleging violations of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and seeking treble damages. Before trial the parties stipulated to the amount Sosnick owed Guild. The trial proceeded on the issues joined on the cross-complaint. The jury decided in favor of Guild. Sosnick appeals from the resulting judgment.

Guild is a wine marketing cooperative controlled by its member grape growers. Guild's share of the Northern California wine market was about 2 percent at pertinent times. Guild was not a wholesale distributor of its products before 1975, but marketed them through several independent wholesalers who also handled wines of Guild's competitors.

---

*Assigned by the Chairperson of the Judicial Council.

Sosnick is a wholesaler of food and beverages based in South San Francisco. During the period which this litigation concerns, Sosnick handled hundreds of items of food and wine.

Fourteen wholesalers distributed Guild wines in Northern California. Guild assigned to each of them an area of primary responsibility adjacent to the wholesaler's headquarters. Sosnick concentrated its Guild wine marketing in San Mateo County. The territories were not entirely exclusive in practice; distributors would sell Guild products outside their territory because of overlapping customer accounts. A distributor who represented Guild in one county might wholesale another company's products in a second county and not infrequently would sell Guild wines to retailers in the latter area. Not surprisingly, this led to complaints by distributors to Guild. The evidence is in conflict as to whether Guild tried to dissuade distributors from poaching on each other's territory.

In 1975, the Guild wholesale distributorship in Fresno terminated. Guild wanted to increase its sales in the Fresno area where most of its growers were concentrated. Guild therefore took over the Fresno wholesaling itself under the name "Valley Distributors." Valley Distributors was not a separate entity, but merely a name under which Guild acted as a distributor.

The previous Fresno distributor had also been selling Guild wines to the Lucky Stores chain, whose central purchasing operations were in San Leandro and not in the Fresno area. When that distributor stopped handling Guild products, Sosnick (who was already selling Kosher foods to Lucky) began selling Guild wines to the chain at Lucky's request. A Guild executive then called Sosnick at least twice and asked Sosnick to cease selling to Lucky because Guild wanted to handle the Lucky account itself through its new Valley Distributors operation. Martin Sosnick testified that the last request was angry and threatening. The Guild executive denied making threats. About two weeks later, Guild terminated Sosnick's contract as a distributor. Several Guild executives testified that the decision to cancel Sosnick preceded the Lucky Stores incident and was not related to it.

It is undisputed that the evidence would support, although not compel, a finding that Sosnick's insistence on selling to Lucky was a substantial factor in Guild's decision to terminate Sosnick's distributorship. The evidence would also support the opposite finding.

The basic disagreement between the parties is whether liability can be predicated upon the former finding. The disagreement arose in a conflict over instructions to the jury. Guild requested and the trial court gave instructions under which Guild would be liable only if, in terminating Sosnick, it joined in and acted in furtherance of an agreement or conspiracy among the competing independent wholesalers to divide the territory and customers between themselves.[1] The jury was precluded from imposing liability if Guild had acted alone, even if it had cancelled Sosnick for his refusal to yield the Lucky account to Guild.[2] Sosnick's proposed instructions, which the trial court declined to give, were based on the theory that such conduct would violate the antitrust laws if it were carried out to enforce an illegal customer allocation agreement.[3]

---

[1]The trial court gave Guild's instruction No. 37: "Under the facts of this case any restrictions and limitations on territories or on customers imposed by Guild on its distributors would not constitute a violation of the antitrust laws entitling Mr. Sosnick to recover unless the acts were taken by Guild not as a producer or manufacturer interested in the distribution of its product, but rather were taken to enforce an agreement or conspiracy among the competing independent wholesalers of its product to divide the territories and customers between themselves.

"If you find that such an agreement existed, that is an agreement between the independent wholesalers to divide the market and to allocate the customers and that Guild, in terminating Sosnick, knowingly joined and acted as a party or acted in furtherance of that agreement, then you must find in favor of Sosnick and against Guild on this issue."

[2]The court also gave Guild's instruction No. 36: "I instruct you that if Guild, provided it was acting alone and not pursuant to an unlawful conspiracy asked Sosnick to cease dealing with Lucky Stores because it wanted to service Lucky Stores and then terminated Sosnick because he refused, an antitrust violation could not be established for that termination."

[3]Sosnick's proposed instructions Nos. 17 and 19 stated: "A seller of goods has a legal right to announce to his customers that he has established a policy prohibiting such customers from reselling the goods to a specified person or persons, and to refuse to deal with any customer who does not follow the policy. But it is illegal for the seller to take affirmative action, such as threatening to stop selling to his customer, to enforce his policy. Furthermore, the law imposes two important limitations on this right:

"First, if a seller announces to his customer a policy which—if accepted by the customer—would result in an illegal horizontal customer allocation agreement, it is illegal for the seller to go beyond a mere announcement of the policy and use other means— such as threats of termination if the customer refuses to comply—which effect adherence to the policy.

"Second, it is illegal for the seller to refuse to deal with a customer, if the refusal is made pursuant to an illegal combination or conspiracy." (Inst. No. 17.)

"If a supplier (such as Guild) having an ongoing business relationship with a distributor (such as Sosnick) requests the distributor to enter into an agreement which would violate the Cartwright Act; if the distributor refuses to enter into the proposed illegal agreement; if the supplier exerts pressure upon the distributor to accept the illegal agreement; and if the supplier terminates the distributor because of the distributor's refusal to accept, then the termination itself is in violation of the Cartwright Act." (Inst. No. 19.)

## II

■ In discussing whether the court's instructions were prejudicially erroneous, we note preliminarily that the Cartwright Act "is patterned upon the federal Sherman Act and both have their roots in common law; hence federal cases interpreting the Sherman Act are applicable with respect to the Cartwright Act." (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].)

■ We observe next that "a refusal of a manufacturer to deal with a distributor can constitute a 'combination' in restraint of trade within the purview" of the Sherman Act. (*Bushie* v. *Stenocord Corporation* (9th Cir. 1972) 460 F.2d 116, 119; *United States* v. *Parke, Davis & Co.* (1960) 362 U.S. 29 [4 L.Ed.2d 505, 80 S.Ct. 503]; *Albrecht* v. *Herald Co.* (1968) 390 U.S. 145 [19 L.Ed.2d 998, 88 S.Ct. 869].)

The question is whether this is one of the situations where a manufacturer's refusal to deal runs afoul of the antitrust laws. The answer hinges on whether Guild's alleged conduct is unlawful per se or whether it is to be judged under the "rule of reason." Sosnick does not contend that the evidence would support antitrust liability under the "rule of reason" approach; were that approach to be taken, the trial court's instructions would either be correct or harmless error.

We conclude that this case—assuming, of course, that Sosnick's refusal to agree to turn the Lucky account over to Valley was a substantial factor in Guild's decision to terminate Sosnick—is governed by a per se principle.

■ It is settled that distributors cannot lawfully agree to divide territories or customers. Such conduct is sometimes called a "horizontal restraint," and is a per se violation of the Sherman Act. (*United States* v. *Topco Associates* (1972) 405 U.S. 596 [31 L.Ed.2d 575, 92 S.Ct. 1126].) The principle has deep roots, going back to *Addyston Pipe & Steel Co.* v. *United States* (1899) 175 U.S. 211 [44 L.Ed. 136, 20 S.Ct. 96]. ■ When Guild became a distributor the same rule became applicable to it. Guild could not lawfully coerce a fellow distributor into allocating customers any more than Sosnick and other distributors could lawfully agree to such an allocation. (*American Motor Inns, Inc.* v. *Holiday Inns, Inc.* (3d Cir. 1975) 521 F.2d 1230, 1253-1254 [territo-

rial restrictions imposed by motel chain on its franchisees are horizontal restraints and illegal per se where the chain also operates motels]; *Hobart Brothers Co.* v. *Malcolm T. Gilliland, Inc.* (5th Cir. 1973) 471 F.2d 894, 899 [illegal horizontal restraint for manufacturer who also distributes to some accounts to limit territories of its distributors so as to eliminate competition between the manufacturer and its distributors].) *Hobart Brothers* and *American Motor Inns* cover the situation before us. (For a recent application of the same principle, see *Krehl* v. *Baskin-Robbins Ice Cream Co.* (C.D.Cal. 1978) 78 F.R.D. 108, 123.)

■ Per se principles are formulated where the conduct involved is manifestly anticompetitive and has no clearly discernible benefits to competition. (*Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 50 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549]; *Marin County Bd. of Realtors* v. *Palsson* (1976) 16 Cal.3d 920, 934 [130 Cal.Rptr. 1, 549 P.2d 833].) The undesirable effects of a manufacturer restraining a distributor from selling to particular customers are that "they serve to suppress all competition between manufacturer and distributor for the custom of the most desirable accounts. . . . [without] . . . countervailing tendencies to foster competition between brands." (*White Motor Co.* v. *United States* (1963) 372 U.S. 253, 272 [9 L.Ed.2d 738, 752, 83 S.Ct. 696] [Brennan, J., conc.].) The anticompetitive consequences were also lucidly noted in *Industrial Bldg. Materials, Inc.* v. *Interchemical Corp.* (9th Cir. 1970) 437 F.2d 1336, 1342, as follows: "The appellee cites many cases for the proposition that a manufacturer is free to agree with others to replace a distributor. In each of those cases, however, the manufacturer did not enter into competition with a distributor, and there was no removal of a competitor of the manufacturer from the market. In none of those cases did the agreement have an anticompetitive purpose or effect. [Citation.] When a distributor is replaced by another, the public is given a substitute with no diminution in the number of distributors offering services, but when a manufacturer enters the field and then removes a distributor, the public is left with only the manufacturer instead of the manufacturer and the independent distributor." (Fn. omitted.)

Guild urges that *Continental T. V., Inc.* v. *GTE Sylvania Inc., supra,* 433 U.S. 36, changes the law. That case held that *vertical,* nonprice restraints by a manufacturer on distributors—e.g., manufacturer allocation of distributor territories—are not automatically unlawful but are to be tested under the rule of reason, i.e., by looking at the economic ef-

fects on competition. In that case, the restrictions required franchisees to sell the products from assigned locations. The manufacturer did not compete with its distributors. Not only is the case factually inapposite, but the court took pains to note that its decision did not alter the rule as to horizontal restraints: "There may be occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers. There is no doubt that restrictions in the latter category would be illegal *per se*, see, e.g., *United States* v. *General Motors Corp.*, 384 U.S. 127 (1966); *United States* v. *Topco Associates, Inc., supra* [405 U.S. 596] . . . ." (433 U.S. 36 at p. 58, fn. 28 [53 L.Ed.2d at p. 585].)

Thus, the per se rule of *Topco* (with which we started this discussion) remains unimpaired. Post-*Continental T. V., Inc.* cases have repeatedly so held, and have held further that horizontal restraints continue to be illegal per se. (See, e.g., *Gough* v. *Rossmoor Corp.* (9th Cir. 1978) 585 F.2d 381, 386; *Oreck Corp.* v. *Whirlpool Corp.* (2d Cir. 1978) 579 F.2d 126, 131 [cert. den. 439 U.S. 946 (58 L.Ed.2d 338, 99 S.Ct. 340)]; *Eiberger* v. *Sony Corp. of America* (S.D.N.Y. 1978) 459 F.Supp. 1276, 1284; *Krehl* v. *Baskin-Robbins Ice Cream Co., supra*, 78 F.R.D. 108 at p. 123; *Du Pont Glore Forgan, Inc.* v. *Am. Tel. & Tel. Co.* (S.D.N.Y. 1977) 437 F.Supp. 1104, 1113; *Pitchford Scientific etc.* v. *PEPI, Inc.* (W.D.Pa. 1977) 435 F.Supp. 685, 688.) *Krehl* is a post-*Continental T. V., Inc.* decision which continues to apply the principles of *American Motor Inns* and *Hobart Brothers, supra*. We follow these cases to conclude that *Continental T. V.* did not sub silentio overrule *Topco*, *American Motor Inns* or *Hobart Brothers*.

At bottom, an antitrust decision of this kind is not an exercise in labeling a particular restraint "vertical" or "horizontal." That can deteriorate into "formalistic line drawing." (*Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36 at pp. 58-59 [53 L.Ed.2d at p. 585].) What matters is that the conduct produces only anticompetitive effects without "countervailing benefits," as we have noted above.

The dissent focuses on conceivably valid reasons of Guild's termination of Sosnick, particularly Guild's claim that he "refused to deliver promotional presale services to retail outlets, and thereby hampered Guild's efforts to increase its market share." Nothing we have said prevents Guild from offering evidence in support of this contention on retrial. Should the jury conclude that Guild terminated Sosnick because

of his inadequate promotion, Guild would prevail. On the other hand, if the termination was caused by his competition for the Lucky account, and not by his alleged failure to promote Guild's products, he would prevail on the liability issue. The concern expressed by the dissent, to the effect that Guild may take reasonable steps to enhance interbrand competition, is thus served.

The dissent would deny recovery to Sosnick, even if he proves that his termination was caused by his refusal to give up the Lucky account, on the ground that he did not also prove that Guild's conduct was "lacking in any redeeming virtue." Such a burden of proof is not necessary for the purpose of enabling the jury to deal with the economic realities of the situation. Moreover, for the reasons we stated earlier, the rule urged by the dissent is contrary to the controlling decisions and would frustrate rather than advance the purposes of the antitrust laws.

## III

To sum up, Guild's liability depended on the causes of Sosnick's termination or the factors substantially affecting it. If one of these causes or factors was Sosnick's refusal to enter into an arrangement effecting a territorial or customer allocation among distributors, an antitrust violation is established. (See *Interphoto Corporation* v. *Minolta Corporation* (S.D.N.Y. 1969) 295 F.Supp. 711, 719-723 [affd. *per curiam* (2d Cir. 1969) 417 F.2d 621]; *Cornwell Quality Tools Co.* v. *C. T. S. Company* (9th Cir. 1971) 446 F.2d 825, 832.) Guild's proposed instructions Nos. 36 and 37, which were given by the trial court, were prejudicial because they informed the jury that liability could not be established unless they first found an "existing" agreement between Guild distributors to "divide the market and allocate customers" and further found that Guild "knowingly joined and acted as a party" to the agreement. In fact, there need not have been a concert of action among distributors, or an overt conspiracy between Guild and the several distributors, in order to establish a per se violation of the antitrust laws. "'If the arrangement or combination . . . is put together through the coercive tactics of the seller alone, this is sufficient.'" (*Hobart Brothers Co.* v. *Malcolm T. Gilliland, Inc., supra*, 471 F.2d 894 at p. 900 [quoting from *Osborn* v. *Sinclair Refining Company* (4th Cir. 1963) 324 F.2d 566, 573-574, fn. 13]. See also *United States* v. *Parke, Davis & Co., supra*, 362 U.S. 29 at pp. 46-47 [4 L.Ed.2d 505 at pp. 516-517].) Such an agreement, combination or conspiracy may also be *inferred*

from Guild's conduct. (See *United States* v. *Parke, Davis & Co., supra,* at p. 40 [4 L.Ed.2d at p. 513].)

Guild's instructions Nos. 36 and 37 should therefore not have been given with respect to the Lucky Stores matter, and Sosnick's instructions Nos. 17 and 19 (or a modification embodying the basic principle of liability which we have outlined) should have been given.

■ Finally, Sosnick contends that the court should not have instructed on the duty to mitigate damages. Under the circumstances, the giving of that instruction was not prejudicial, but a broad mitigation rule finds no support in appellate antitrust decisions. In the event of a retrial, the court may instruct instead that as an element of damage Sosnick must show the lack of an alternative comparable substitute for the products formerly obtained from Guild. (*Elder-Beerman Stores Corp.* v. *Federated Dept. Stores, Inc.* (6th Cir. 1972) 459 F.2d 138, 148.)

The judgment is reversed. The purported appeal from the order denying a new trial is dismissed.

Rattigan, Acting P. J., concurred.

**CHRISTIAN, J.**—I respectfully dissent.

The majority opinion sets out a clear and well ordered review of the pertinent authorities; but I cannot concur in the decision because, in my view, the opinion inappropriately applies "per se" antitrust doctrine in such a way as to punish as anticompetitive an act which according to the evidence had predominantly procompetitive purposes and effects.

At the times relevant to this appeal, there was no price competition between wholesale distributors of Guild products. Guild set the prices at which Guild sold to the wholesale distributors, the distributors sold to retail outlets, and retailers sold to consumers. (See Bus. & Prof. Code, §§ 24850-24881. Of later effect are *Rice* v. *Alcoholic Bev. etc. Appeals Bd.* (1978) 21 Cal.3d 431 [146 Cal.Rptr. 585, 579 P.2d 476] [statutory liquor price-fixing scheme violates Sherman Antitrust Act] and *Midcal Aluminum, Inc.* v. *Rice* (1979) 90 Cal.App.3d 979 [153 Cal.Rptr. 757], cert. granted *sub. nom. Calif. Retail Liquor Assn.* v. *Midcal Aluminum*

(1979) 444 U.S. 824 [62 L.Ed.2d 31, 100 S.Ct. 45] [statutory wine price-fixing scheme violates Sherman Antitrust Act].)

Guild executives testified that the commercial success of a producer's wine line depends heavily on the promotional presale services offered by wholesale distributors to retail outlets. The executives testified that to build consumer preference or demand for a particular wine brand, distributors had to engage in promotional activities with retail outlets to, e.g., set up floor displays for the brand, stock the brand at eye level rather than on bottom shelves, maintain well stocked refrigeration units of the chilled brand, promote white wines at Thanksgiving and red wines in winter, and so on. The spread between the price at which Guild sold its products to the distributors, and the higher price at which the distributors sold the products to the retailers, included an allowance to reimburse the distributors for performing these presale activities.

Each distributor had an area of primary responsibility. This was a geographical area adjacent to the distributor's office and warehouse in which the distributor was expected to develop demand for Guild products by delivering presale services to retailers. Guild did not prohibit distributors from making sales outside of their own territories, although sales goals, promotional requirements, and practical geographical constraints generally ensured that each distributor concentrated its sales efforts in its own area. There was some problem with "highspotting" or "freeriders": Typically, each distributor's territory included some retail outlets that purchased a high volume of Guild products, and some outlets that purchased a low volume. A distributor in one territory would expend resources to promote Guild products to both large and low volume retailers. A second distributor from another territory then would "raid" the first territory, and sell the Guild products to the large-volume retailers without having incurred any promotional costs in connection with those retailers. The remaining low volume sales would be insufficient to compensate the first distributor for the costs that it had incurred in delivering the presale services to all retailers in the territory. Even though the revenue from the sales to the low-volume outlets was not sufficient to cover distribution costs to those outlets, Guild considered it necessary to keep the outlets stocked: If Guild products were not readily available to the ultimate consumer even in small retail outlets,

consumers would lose or not develop a preference for the Guild brand. There was conflicting testimony as to whether Guild ever intervened to prevent this freeriding.

In January of 1975, Guild hired Jack Dadum as senior vice-president in charge of marketing and sales. Dadum found Guild's low market share and promotional practices "horrible." In consultation with other Guild executives, he took several steps to increase Guild's market share, including three that are relevant here. First, Guild was dissatisfied with the promotional efforts and sales of DiNubilo and Company, the independent distributor in the San Joaquin Valley where most of the growermembers of the Guild cooperative were concentrated. Second, Guild management decided to integrate vertically by establishing Guild's own unincorporated wholesale distribution division, Valley Distributors, to replace DiNubilo. On March 1, 1975, Guild established Valley Distributors and terminated DiNubilo. The San Joaquin Valley became Valley Distributor's area of primary responsibility. Valley handled Guild products exclusively.

DiNubilo's major customer for Guild products had been Lucky Stores. Lucky was also one of the major retail outlet purchasers of Guild products in Northern California. When Valley Distributors took over DiNubilo's territory, Guild management expected the Lucky account to go to Valley. The revenue from the large volume sales to Lucky was necessary to offset the expenses of operating Valley Distributors. However, while DiNubilo had been supplying Guild products to Lucky, Sosnick had been supplying a line of Kosher foods to Lucky. When Guild terminated DiNubilo, Lucky began purchasing Guild products (in addition to Kosher foods) from Sosnick instead of from Valley.

On April 3, Guild took the third marketing step relevant here. Guild terminated Sosnick as an independent distributor. Guild contends that it terminated Sosnick because Sosnick had consistently refused to deliver promotional presale services to retail outlets, and thereby hampered Guild's efforts to increase its market share by developing consumer preference for Guild wines. Guild claims that it decided to terminate Sosnick before Sosnick started selling to Lucky. Sosnick contends that it was terminated because it captured the Lucky Stores account, which Guild sought to reserve for Valley Distributors.

The crucial issue is whether Guild's conduct is to be examined under the rule of reason, or whether the conduct was illegal per se. Sosnick

concedes that if Guild's conduct is examined under the rule of reason, then Guild's conduct was not illegal and the judgment must be affirmed. In my view the rule of reason is applicable and the judgment should be affirmed.

The legality of nonprice distribution restraints[1] was at issue in *U. S. v. Arnold, Schwinn & Co.* (1967) 388 U.S. 365 [18 L.Ed.2d 1249, 87 S.Ct. 1856]. Bicycle manufacturer Schwinn marketed its products through three principal methods: (1) sales to wholesale distributors; (2) sales to retailers by means of consignment or agency arrangements with distributors; and (3) sales to retailers under the so-called Schwinn Plan, which involved direct shipment by Schwinn to the retailer with Schwinn invoicing the dealers, extending credit, and paying a commission to the distributor taking the order. Schwinn assigned specific territories to each distributor, and each distributor could sell only to franchised retail outlets within its assigned territory. Each franchised retailer could purchase Schwinn products only from or through the distributor authorized to serve the retailer's area, and the retailer could sell only to consumers, not to unfranchised retailers. The Supreme Court held that section 1 of the Sherman Act required differentiation between the situation where the manufacturer parts with title, dominion, or risk with respect to its products, and where the manufacturer completely retains ownership and risk of loss. The court held nonprice distribution restrictions to be illegal per se if the manufacturer *sold* its products to distributors or retailers. The court found that such restrictions violated "the ancient rule against restraints on alienation." (388 U.S. at p. 380 [18 L.Ed.2d at p. 1261].) However, nonprice restrictions were to be examined under the rule of reason if the manufacturer retained title, dominion, and risk with respect to the product, and the position and function of the distributor or retailer were indistinguishable from those of an agent or salesman of the manufacturer. The great weight of scholarly opinion was critical of the *Schwinn* decision. (See, e.g., *Continental T. V., Inc. v. GTE Sylvania Inc.* (1977) 433 U.S. 36, 48 fn. 13 [53 L.Ed.2d 568, 579, 97 S.Ct. 2549], and authorities cited.)

---

[1]A nonprice distribution restraint restricts competition among wholesale or retail distributors by, e.g., forbidding distributors from selling from any but a designated location, assigning exclusive territories to distributors, reserving certain customers to the manufacturer, forbidding wholesale distributors from selling to other than authorized retail outlets, or forbidding distributors from selling to other distributors. (See Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision* (1977) 45 U.Chi.L.Rev. 1.)

The legality of nonprice distribution restraints and the continuing vitality of the *Schwinn* rule were at issue in *Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36. GTE Sylvania Inc. manufactured television sets. It originally marketed its product through independent or company-owned wholesalers, who in turn resold to a large and diverse group of retailers for sale to the ultimate consumer. Prompted by a decline in its market share to a relatively insignificant 1 to 2 percent of national television sales in an industry with more than 100 manufacturers, Sylvania in 1962 phased out its wholesale distributors and began to sell to a smaller and more select group of franchised retailers. An acknowledged purpose of the new franchise plan was to decrease the number of competing Sylvania retailers in the hope of attracting the more aggressive and competent retailers thought necessary to improve the manufacturer's market position. Sylvania imposed location restrictions[2] on its retailers. By 1965 Sylvania ranked eighth in national television sales with 5 percent of the market. In 1965 Sylvania, dissatisfied with its sales in San Francisco, added another retail outlet in the city. The existing San Francisco retailer, Continental T. V., protested the addition. Continental also requested a franchise in Sacramento. Sylvania refused the request because it felt that the existing Sacramento retailers adequately serviced the Sacramento area. Relations between Continental and Sylvania deteriorated. Sylvania terminated the Continental franchise, and Continental brought suit for antitrust violations. The district court, applying the *Schwinn* rule, instructed the jury that if Sylvania imposed postsale territorial restrictions on its retailers, the conduct was illegal per se. The district court entered judgment on the jury verdict finding Sylvania liable for treble damages for violating section 1 of the Sherman Act. The United States Supreme Court disapproved the per se rule stated in *Schwinn* (433 U.S. 36, 58 [53 L.Ed.2d 568, 585]), and affirmed the decision of the Ninth Circuit reversing the district court judgment (*id.*, at p. 59 [53 L.Ed.2d at pp. 585-586]).

The "rule of reason" is the prevailing standard of analysis to be used in evaluating combinations in restraint of trade or commerce. Under this rule, the factfinder weighs all of the circumstances of a case in de-

---

[2]A location restriction limits a distributor's sales of a manufacturer's product to certain authorized outlets. The manufacturer does not assign specific territories, but as a practical matter the size of each distributor's market will be controlled and limited by the number of authorized outlets. (Note, *Antitrust Treatment of Intrabrand Territorial Restraints Within a Dual Distribution System* (1978) 56 Texas L.Rev. 1486, 1487 fn. 8.)

ciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.[3] (*Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36, 49 [53 L.Ed.2d 568, 580].)

Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. (*Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36, 49-50 [53 L.Ed.2d 568, 580].) "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].) Per se rules require a court to make broad generalizations about the social utility of particular commercial practices. The probability that anticompetitive consequences will result from a practice, and the severity of those consequences, must be balanced against its procompetitive consequences. A per se rule reflects the judgment that exceptions to the generalization may arise, but such exceptions are not sufficiently common or important to justify the time and expense necessary to identify them. (*Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36, 50 fn. 16 [53 L.Ed.2d 568, 580].) Per se rules must be based on demonstrable economic effects (*id.*, at pp. 58-59 [53 L.Ed.2d at p. 585]). (See also Sullivan, Antitrust (1977) pp. 165-194.)

The *Sylvania* court recognized that nonprice distribution restrictions reduce intrabrand competition but promote interbrand competition. Nonprice restraints reduce intrabrand competition, the competition between wholesale or retail distributors of the product of a particular manufacturer, by limiting the number of sellers of the product competing for the business of a given group of buyers. However, the *Sylvania*

---

[3]The classic statement of the rule of reason is that of Mr. Justice Brandeis in *Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 687, 38 S.Ct. 242]: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

court held that nonprice restrictions do not have such a pernicious effect on competition and are not so lacking of any redeeming virtue as to be illegal per se. (433 U.S. 36, 52 fn. 19, 54, 58-59 [53 L.Ed.2d 568, 581, 583, 585].)

The *Sylvania* court identified the "'redeeming virtues'" of nonprice distribution restrictions. (433 U.S. 36, 54 [53 L.Ed.2d 568, 583].) Interbrand competition, the competition among the manufacturers of the same generic product, "is the primary concern of antitrust law." (*Id.*, at p. 52 fn. 19 [53 L.Ed.2d at p. 581].) Nonprice restrictions may allow a manufacturer to achieve certain efficiencies in the distribution of its products, and thus to compete more effectively against other manufacturers. For example, manufacturers can use nonprice distribution restrictions, such as the territorial restrictions at issue in the present case, to induce distributors to engage in the promotional presale services thought necessary to the efficient marketing of their product. The availability and quality of such services affect a manufacturer's goodwill and the interbrand competitiveness of its product. In the absence of the distribution restriction, the "free rider" problem could arise: If one distributor offered promotional presale services, other unrestricted distributors could capture the first dealer's customers without having provided any presale services to those customers, and thus take a "free ride" on the first distributor's services. This could deter delivery of the optimal amount of presale services. (*Id.*, at pp. 54-55 [53 L.Ed.2d at p. 583], citing Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions* (1975) 75 Colum.L.Rev. 282; Preston, *Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards* (1965) 30 Law & Contemp. Prob. 506, 511; Samuelson, Economics (10th ed. 1976) pp. 506-507. See generally Posner, Antitrust Law: An Economic Perspective (1976) pp. 147-167; Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision, supra*, 45 U.Chi.L.Rev. 1; Telser, *Why Should Manufacturers Want Fair Trade?* (1960) 3 J. Law & Econ. 86. But see Comanor, *Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath* (1968) 81 Harv.L.Rev. 1419. See also Sullivan, Antitrust, *supra*, pp. 399-421.)

The *Sylvania* court held that the adverse effects of nonprice distribution restrictions on intrabrand competition are outweighed by the potential for beneficial effects on interbrand competition. The restrictions therefore must be reviewed under the rule of reason, rather than

under the per se doctrine. (433 U.S. 36, 57-59 [53 L.Ed.2d 568, 584-585]. See generally ABA Antitrust Section, Monograph No. 2, *Vertical Restrictions Limiting Intrabrand Competition* (1977) pp. 55-71; Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division* (1965) 74 Yale L.J. 775, (1966) 75 Yale L.J.373; Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision, supra,* 45 U.Chi.L.Rev. 1, 13-20.)

The majority opinion holds that the reasoning of the *Sylvania* decision does not apply to the present case. Guild was both a producer and a distributor of wine. As a producer, Guild was a supplier of and stood in a vertical relation to Sosnick. As a distributor, Guild was a competitor and stood in a horizontal relation to Sosnick. The question is whether the territorial and customer restrictions imposed by Guild must be treated as horizontal restrictions that are illegal per se under *United States* v. *Topco Associates* (1972) 405 U.S. 596 [31 L.Ed.2d 515, 92 S.Ct. 1126].

The language of the *Sylvania* decision is limited to vertical nonprice distribution restrictions. In a footnote the court stated that horizontal nonprice distribution restrictions originating in agreements among retailers would be illegal per se. (433 U.S. 36, 58, fn. 28 [53 L.Ed.2d 568, 585], citing *United States* v. *Topco Associates, supra,* 405 U.S. 596, and *United States* v. *General Motors Corp.* (1966) 384 U.S. 127 [16 L.Ed.2d 415, 86 S.Ct. 1321].) The meaning of this dictum is unclear. Whether distribution restrictions are to be examined under the rule of reason or under the per se doctrine should not turn on whether the restrictions were imposed by the manufacturer or by downstream distributors. The *Sylvania* court acknowledged that the location restrictions at issue there "involved understandings or agreements with the retailers." (433 U.S. 36, 40 fn. 8 [53 L.Ed.2d 568, 574].) As Professor Posner points out: "Dealers as well as the manufacturer are hurt by free-riding; it is a detail whether the initiative in seeking to prevent free-riding was taken by the dealers or the manufacturer. This point was missed in Justice Fortas's opinion for the Court in [*United States* v. *General Motors Corp., supra,* 384 U.S. 127]....The Court...ruled that because competing dealers had collaborated to enlist General Motors' assistance in enforcing the location clause, the case involved an illegal per se horizontal conspiracy, regardless of the reasonableness of the clause. But if the clause was reasonable, the dealers should have been entitled to band together for the innocent purpose of persuading General Motors to carry out mutually beneficial contractual obliga-

tions." (Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision, supra*, 45 U.Chi.L.Rev. 1, 19-20. See also Posner, Antitrust Law: An Economic Perspective, *supra*, pp. 165-166; Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term*-1977 (1977) 77 Colum.L.Rev. 979, 986-989.)

Moreover, the *Sylvania* court recognized that problems would arise in differentiating vertical from horizontal distribution restrictions. (433 U.S. 36, 58, fn. 28 [53 L.Ed.2d 568, 585].) In the instant case, Guild was both a producer and a distributor of wine, and also used independent wholesale distributors. Whether nonprice distribution restrictions in such a dual distribution system[4] are to be examined under the rule of reason or under the per se doctrine should not turn on whether the restrictions are pigeonholed as horizontal or vertical. This is the type of "formalistic line drawing" condemned in *Sylvania*. (433 U.S. 36, 59 [53 L.Ed.2d 568, 585]. See also Note, *Antitrust Treatment of Intrabrand Territorial Restraints Within a Dual Distribution System, supra*, 56 Texas L.Rev. 1486 and cases cited.)

The Supreme Court in *Topco* stated that the courts should use per se rules as a substitute for examining "difficult economic problems" (405 U.S. 596, 609 [31 L.Ed.2d 515, 526]) because courts are "of limited utility" (*ibid.*) in balancing the effects of distribution restrictions on intrabrand versus interbrand competition. (*Id.*, pp. 609-612 [31 L.Ed.2d 526-528].) This cannot be reconciled with the position taken by the Supreme Court in *Sylvania*. The *Sylvania* court, influenced by the economic literature (see, e.g., 433 U.S. 36, 54-57 [53 L.Ed.2d 568, 582-585] and authorities cited), concluded that courts must assess the intent, competitive impact, and demonstrable economic effect of a nonprice distribution restriction before declaring the restraint to be prohibited by the antitrust laws. (*Id.*, at pp. 46, 59 [53 L.Ed.2d at pp. 577, 585].) The *Topco* court felt that without per se rules, the business community would be left with little guidance as to what courts will

---

[4]"A manufacturer employing a dual distribution system markets a product through two separate and competitive channels. The manufacturer supplies independent retailers either directly or through its wholly-owned branch distributors. It also supplies the product to independent distributors who resell to retailers. Consequently, the manufacturer, whether or not vertically integrated, faces competition on two market levels. On the production level, it competes interbrand with other manufacturers of the same generic product; on the distribution level, it competes intrabrand with the independent distributors of its own brand." (Note, *Antitrust Treatment of Intrabrand Territorial Restraints Within a Dual Distribution System, supra*, 56 Texas L.Rev. 1486, 1489.)

find to be legal and illegal under the Sherman Act (405 U.S. 596, 609, fn. 10 [31 L.Ed.2d 515, 527]). The *Sylvania* court acknowledged that per se rules provide guidance to the business community and minimized the burdens on the courts and litigants as compared to rule of reason trials. However, the *Sylvania* court held that those advantages are not sufficient in themselves to justify the creation of per se rules. The *Topco* court referred to the antitrust laws as "the Magna Carta of free enterprise" (405 U.S. 596, 610 [31 L.Ed.2d 515, 527]) which guaranteed every business the freedom to compete in every section of the economy, whether intrabrand or interbrand (*id.*, at pp. 610-612 [31 L.Ed.2d at pp. 527-528]). This is contrary to the *Sylvania* court's explicit sanctioning of limits on wholesale and retail dealer autonomy.

It appears that the per se rule of *Topco* should be limited to situations where "it is clear that the restraint . . . is a horizontal one" (*United States* v. *Topco Associates, supra*, 405 U.S. 596, 608 [31 L.Ed.2d 515, 526]) "originating in agreements among . . . retailers" (*Continental T. V., Inc.* v. *GTE Sylvania Inc., supra*, 433 U.S. 36, 58, fn. 28 [53 L.Ed.2d 568, 585]; see also *id.*, at p. 48, fn. 14 [53 L.Ed.2d at p. 579]; cf. *Fuchs Sugars and Syrups, Inc.* v. *Amstar Corp.* (2d Cir. 1979) 602 F.2d 1025, 1030, cert. den. (Oct. 16, 1979) 444 U.S. 917 [62 L.Ed.2d 172, 100 S.Ct. 232]; *Magnus Petroleum Co., Inc.* v. *Skelly Oil Co.* (7th Cir. 1979) 599 F.2d 196, 204, cert. den. (Oct. 16, 1979) 444 U.S. 916 [62 L.Ed.2d 171, 100 S.Ct. 231]). The challenged restrictions in the present case are not exclusively horizontal, and there is no evidence that the restrictions originated in agreements among retailers. There was substantial evidence that Guild adopted the restrictions in order to promote interbrand competition and to guard against freeriders. Sosnick did not establish that Guild's conduct had such a pernicious effect on competition and was so lacking in any redeeming virtue as to be illegal per se. I would hold that the restrictions should be reviewed under the *Sylvania* rule of reason approach. Sosnick does not argue that the Guild restrictions are illegal under the rule of reason.

I would affirm the judgment.

A petition for a rehearing was denied February 25, 1980. Christian, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 27, 1980. Clark, J., was of the opinion that the petition should be granted.